JACKSON, *ex dem.* WOODRUFF AND OTHERS, *against* GIL-
CHRIST.

THIS was an action of ejectment brought to recover part of lot No. 2, in the subdivision of lot No. 8, in the thirteenth general allotment of the *Kayaderosseras* patent, being about 119 acres of land, situate in the town of *Clinton*, in the county of *Saratoga*. The cause was tried at the *Saratoga* circuit, in *September*, 1816.

By the patent of Queen *Anne*, dated the 2d of *November*, 1708, a tract of land called *Kayaderosseras*, was granted to *Nanning Hermense*, *Johannes Beekman*, *Rip Van Dam*, *Ann Bridges*, and nine other persons. *Ann Bridges*, afterwards, married *Joshua Hunloke*, and the plaintiff deduced a regular title by descent from her. By deeds of lease and release, dated the 10th and 12th of *February*, 1711, between *Joshua Hunloke* of *Elizabethtown*, in the province of *East New-Jersey*, gentleman, and *Ann* his wife, of the one part, and *Peter Fauconier* of the city of *New-York*, merchant, of the other part; the parties of the first part, in consideration of the sum of 60*l. New-York* currency, conveyed to the party of the second part, in fee, the thirteenth undivided part of the *Kayaderosseras* patent. On both deeds the following endorsement was written : " This day came before

*Whether, before the colonial act of 1771, the interest of a feme covert in land could, in this state, be conveyed otherwise than by fine? Quere. Where the certificate of a justice of the peace, in 1711, of the acknowledgment of a deed, stated that A., and B. his wife, came before him " to acknowledge this indenture to be their acts and deed;" it was held that the certificate could not be understood to mean merely that the parties came before the justice to acknowledge the deed, or with such an intent; but, further, that they did acknowledge it; and that, after such a lapse of time, the private examination of the wife ought to be presumed; and that the estate acquired under a deed thus acknowledged, was confirmed by the act of 1771.*

The charter of 1683, of *James* Duke of *York*, was not in force after the revolution, in 1688.

The preamble of a statute may be referred to, to explain the enacting part, when it is doubtful, but not to restrain its meaning when clear and unambiguous.

The statute of 1771, " to confirm certain ancient conveyances," provided, that no claim to any real estate whereof any person was then actually possessed, should be deemed to be void upon the pretence that the *feme covert* granting the same, had not been privately examined : it seems that in respect of new and unsettled lands, the constructive possession arising from the right of property, is sufficient to satisfy the words of the act, such possession being sufficient, in other cases ; as to entitle the husband to an estate by the curtesy, or to enable the owner to maintain trespass.

me, one of his majesty's justices for the county of *Essex*, the within-mentioned *Joshua Hunloke*, and *Ann* his wife, to acknowledge this indenture to be their acts and deed : this nineteenth of *February*, one thousand seven hundred and eleven, alias twelve.    Attested per me, *Jno. Blanchard*." The defendant's title was derived from this deed through sundry mesne conveyances.

A partition of the patent, pursuant to the act of the 8th of *January*, 1762, was commenced in 1769, and completed and filed in the clerk's office of the county of *Albany*, on the 4th of *March*, 1771, by which lot No. 8, in the thirteenth general allotment of the patent, was drawn to the share of *Ann Bridges*.    Several deeds were given in evidence, on the part of the defendant, to show acts of ownership and assertion of title by persons deriving title from *Fauconier ;* and parol evidence was also given in support of the defence of adverse possession ; which, however, it is not necessary to state.

A verdict was taken for the plaintiff, subject to the opinion of the court, on a case to be made.

*Henry*, for the plaintiff.   1. The lessors of the plaintiff have proved a complete right, by *descent*, from *Ann Bridges*, one of the patentees of the *Kayaderosseras* patent, to the premises in question.    But it will be attempted, on the part of the defendant, to show that *Ann Bridges* aliened her title, by the release of the 12th of *February*, 1711, from her and her husband, (*Joshua Hunloke*,) to *Peter Fauconier*.    We shall, therefore, contend, (2.) That the deed from *Hunloke* and his wife, was altogether void and inoperative as to her and her heirs at law.    It is a clear and settled principle of the common law, that a conveyance, or other contract, of a *feme covert*, unless by some matter of record, is absolutely void, and not merely voidable, and it cannot be affirmed, or made good, by any subsequent agreement.    (2. *Bl. Com.* 293.   *Perkins*, § 154.   1 *Sid.* 120.)   The husband has no power to convey his wife's land in fee ; and if she joins in the conveyance, unless by matter of record, it is absolutely void.    If she joins in a lease for a term of years, it is voidable only.    As the conveyance by *Ann Bridges* was not by fine,

or matter of record, and as she was not privately examined, and her acknowledgment taken as to the execution of the deed, according to the act, it is void ; and her estate, on her decease, descended to *Hunloke Woodruff*, a minor, who resided in *New-Jersey*, until just before the commencement of the revolutionary war, and who, about the close of the war, came to *Albany*, where he resided until his death, in *July*, 1811. His children are the lessors of the plaintiff. But it will be said that the act of the colonial legislature of *New-York*, passed the 16th of *February*, 1771, (*Van Schaack's* edit. of the laws, p. 611.) confirmed and made valid this conveyance. That statute, if it has any operation on this case, goes to devest a right vested in *II. W.*, the heir by the common law ; and ought, therefore, on general principles of law, to be considered as void.

By the charter of liberties and privileges granted by the proprietary government, or the Duke of *York*, passed *October* 30, 1683, and which was the *Magna Charta* of the inhabitants of the province, it is declared, " that no man, of what estate or condition soever, shall be put out of his lands or tenements, nor taken, nor imprisoned, nor disinherited, nor banished, nor any ways destroyed, without being brought to answer by due course of law." It also declares, " That no estate of a *feme covert* shall be sold or conveyed but by deed acknowledged by her in some court of record, the woman being secretly examined, if she doth it freely, without threats or compulsion of her husband." (See 2 *N. R. L. Appendix* III. IV. V.) It contains the principle of the *English Magna Charta*, and of the Bill of Rights of the people of this state, that no person shall be disseised of his freehold, &c. but by the lawful judgment of his peers or due process of law. (1 *N. R. L.* 45.) The *Magna Charta* of *England* is a limitation of the powers of the *British* parliament ; and a colonial legislature, which could make no laws repugnant to the laws of *England*, nor claim that omnipotence which is said to belong to parliament, could not make a law in violation of this great charter of rights. (1 *Bl. Com.* 138, 139.) The act was, therefore, void, as contrary to the laws of *England*. In the case of *Gardner* v. The Trustees of the Village of *Newburgh*, (2 *Johns. Ch. Rep.* 162.)

the chancellor held, that the legislature could not take away private property, even for necessary public purposes, without providing a fair compensation to the owner ; and he cites numerous authorities, in support of this doctrine, from books of jurists, and the codes and constitutions of different countries. This court has, also, in several cases, recognised the same doctrine. (*Jackson* v. *Catlin,* 2 *Johns. Rep.* 248. 263. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477—508. *Catlin* v. *Jackson, in Error,* 8 *Johns Rep.* 520. 539—556.)

But if this statute is not void, it is inapplicable to the present case. Being in derogation of a common law right, it must be construed strictly. It affects those deeds only where the persons claiming under them are in the *actual possession* of the land. The words are, " That no claim to any real estate whereof any person is now *actually possessed,* whether as tenant in common, or otherwise, shall be deemed void upon the pretence, that the *feme covert* granting the same had not been privately examined before any of the public officers," &c. Mere *constructive* possession is not sufficient. There must be an *actual pedis possessio* under the deed. Again ; the act confirms those deeds only where the *feme covert* had not been privately examined before public officers, &c. This can refer only to public officers or magistrates of the colony of *New-York,* not to a case like this, where the acknowledgment was in *Essex* county, in *New-Jersey.*

It will be said, perhaps, that there is a presumption arising from lapse of time, that the right of *Ann Bridges* has been extinguished. But the case affords no evidence of any acts or facts which can authorize this presumption. From mere silence or inaction no inference can be drawn, or presumption raised of the extinguishment of right, for a time short of the period of the statute of limitations. No matter how many conveyances there may be, or through how many hands the land may have passed, the presumption cannot avail, unless possession accompanies the claim of right. A presumption from mere length of time, to support a right, is very different from a presumption to defeat a right. (*Phillips' L. of Ev.* 117, 118—124. 10 *Johns. Rep.* 377. 7 *Johns. Rep.* 5. 1 *Caines,* 84. 6 *Binney's Rep.* 416. 10

*Mass. Rep.* 105. 5 *Cranch*, 262.) There can be no ad-
verse possession in this case; for the defendant entered,
claiming title from *J. H.* and *Ann Bridges*, by an inopera-
tive conveyance. They derive title from the ancestors of
the lessors of the plaintiff, and cannot allege that they en-
tered adversely. (*Jackson* v. *Sears*, 10 *Johns. Rep.* 435.)
There is, also, a recital in the deed which estops him from
setting up another title. (*Phillips' Evid.* 355.)

The lease to *De Groff* affords no evidence of a construc-
tive possession. He entered, and was possessed in severalty,
by metes and bounds, and his entry cannot be extended be-
yond those limits; and those claiming under him can go
no further. The rents issued out of this particular parcel,
and afford no evidence of a constructive possession of the
whole; besides, the covenant is to pay all the quit rents to
the crown. Mere perception of profits does not amount to
an ouster of possession. (1 *Bl. Rep.* 675. 2 *Bl. Rep.* 690.
*Cowp.* 217. 1 *Wils.* 176.) The payment of taxes is not
evidence of possession. (*Jackson* v. *Myers*, 3 *Johns. Rep.*
388.) The defendant must show, affirmatively, the facts
from which the presumption is to be drawn.

*Van Buren*, (Attorney General,) and *Van Vechten*, contra.
1. The lessors of the plaintiff are the *fifth* generation from
the patentee; and during more than a century, there has
been no assertion of right on their part, or by any of their
ancestors; and from the date of the deed of partition, until
the commencement of this suit, there has been no act of
ownership or assertion of claim on the part of the lessors.
After such a lapse of time, their claim is to be regarded with
a jealous eye; and every possible indulgence, as to pre-
sumption, ought to be shown to the defendant, in order to
quiet the extensive possessions under this patent. The
deed from *J. H.* and *Ann Bridges* is technically and formal-
ly drawn, and is duly executed by the grantors, and acknow-
ledged before a justice of the peace. It is objected that this
acknowledgment by the wife was not made according to
the laws of the colony of *New-York*, and that the deed is,
therefore, void. But, we contend that there is no evidence
of the existence of any law of the colony, at the time the
deed was executed, which required any different mode of

taking the acknowledgment. The *Charter of Liberties and Privileges* granted by the Duke of *York*, the 30th of *October*, 1683, for the better establishing the government of the province, &c. which has been cited to show the existing law of the colony, never had the force of law. The authority of it was denied by the first colonial legislature, which commenced in 1691, under *William* and *Mary*. They disavowed all the acts of the Duke of *York*, as such, or as *James* II., after he came to the crown, and passed a new bill of privileges, which was afterwards repealed by the king, the 11th of *May*, 1697. (*Journ. of Gen. Ass.* p. 8. *Bradford's* ed. *Laws of New-York*, 1. 4.) In 1710, Mr. *Bradford* published his revision and digest of the laws of the province, which contain no reference to the Duke of *York's* charter. In 1752, another revision of the laws was made by *Smith* and *Livingston*, and they take no notice of this charter. In *March*, 1772, an act was passed to revise, digest, and print the laws of the colony, and *Van Schaack* was authorized to revise, digest, and collect all the laws in force in the colony, from the *revolution*, (1688,) until that time. (*Van Schaack's* ed. *Laws*, 676.) The first act in these collections is in the names of *William* and *Mary*, passed the 6th of *May*, 1691, for quieting and settling the disorders in the province; and for establishing and securing their majesties' present government from like disorders in future; and declaring that no power or authority could be held or exercised in the province but what was derived from the magistrates. There was, then, no act, statute, or charter, existing in the colony, regulating the mode of conveyance by a *feme covert*. Indeed, the preamble to the act of 1771, clearly shows that there was no previous statute regulation on the subject.

Again; it is said, that, by the common law of *England*, a *feme covert* cannot convey her estate, unless by matter of record, as by fine, or common recovery; and that the deed is, therefore, void at common law. But what evidence is there, that the common law of *England* extended to the province, or that it was in force here, as such, prior to the constitution of the state? *New-York*, by the name of the *New-Netherlands*, was a *Dutch* colony, until 1674, when it surrendered to the Duke of *York*, and was

.ceded to *England* by the treaty of *Breda*, in 1667, and the duke afterwards, in 1674, took out a new patent from the crown. It was a conquered province; and being held by right of conquest, the common law of *England* was not, of course, introduced; but the former laws and customs continued in force until actually changed, and new laws imposed. The common law does not attach to a conquered province, without a special ordinance for that purpose. (2 *P. Wms.* 74, 75. *Blankard* v. *Galdy, Salk.* 411. 1 *Bl. Com.* 107, 108. *Tucker's ed. of Bl. Com.* 381. *Smith's Hist. of N. Y. Carey's ed.* 268. 271. note, opinion of Sir *John Randolph.*) By the articles of capitulation of 1664, (art. 11.) between the *Dutch* governor and the *English* commissioners, the *Dutch* laws and customs were expressly saved and secured to the inhabitants; and this was recognised by an act of the legislature of the colony, passed the 5th of *July*, 1715, (*Van Schaack's* ed. laws, 97.) There was, then, no *English* common law, rule, or custom, existing on the subject; and the preamble to the act of the 6th of *February*, 1771, (*Van Schaack's* ed. p. 611.) speaks of the *ancient practice* of the colony to record deeds so acknowledged, thereby excluding the idea of any statute having been passed, relative to conveyances by *feme coverts.* On one of the deeds, given in evidence, and set forth in the case, from *J. Ross* and his wife, dated the 26th of *November*, 1750, there is an endorsement of the 19th of *May*, 1769, that the wife then appeared before *D. Horsemanden*, Esq. chief justice of the supreme court, &c. and acknowledged it to be her voluntary act and deed, and it was, therefore, allowed to be recorded. A similar proof, or acknowledgment, of the deed of *De Groff*, was taken before Judge *Smith.* Indeed, our records are filled with deeds by married women, upon their acknowledgment before justices of the peace, judges, and various public magistrates, without any private examination. A similar practice, relative to conveyances by *feme coverts*, existed in all the colonies. (*Davy* v. *Turner*, 1 *Dallas*, 11. *Lloyd* v. *Taylor*, 1 *Dall.* 17. *Lessee of Watson* v. *Bailey*, 1 *Binney's Rep.* 470. *Fowler* v. *Shearer*, 7 *Mass. Rep.* 14. 18, 19.) The supreme court of *Pennsylvania* thought it a most proper case for the application of the maxim, *commu-*

*nis error facit jus.* A custom of a particular town, or city, or county, as to conveyances by infants and *feme coverts*, has been considered as an exception to the general rule of the common law. (*Hob.* 225. *Bro. Abr.* 320. pl. 15.) Thus, in the case in *Dyer*, which is very analogous, the custom, in the town of *Denbigh*, in *Wales*, that a *feme covert* might aliene her land, by surrender and examination in court, was held good and valid, (*Dyer's Rep.* 363. *b.*) notwithstanding the statute of 27 *Hen.* VIII. ch. 26. If, then, there was no legislative provision, requiring a different mode of acknowledgment, or conveyance, will the court disturb these possessions, for a slight mistake in a matter of form ? In *Jackson* v. *Schoonmaker*, (2 *Johns. Rep.* 230. 234.) where a deed had been proved, by the oath only of a surviving trustee, before a judge, in 1750, *Kent*, Ch. J. said, that, until 1771, " the practice of taking the proof of deeds was loose and unsettled. That the practice in the colony, before that time, was undoubtedly to be regarded on a question touching the validity of an ancient deed ;" and the deed was held valid, so as to establish the plaintiff's title. A strict and literal conformity to a statute will not be required in such a case. Admitting, even, that there was a statute of the colonial legislature on the subject, requiring a private examination of the wife as to the execution of a deed, it does not appear, and is not to be presumed, that the act required the magistrate to endorse a certificate of such examination, on the deed ; he might have been brought into court, as a witness, to prove the fact. Is the defendant 'to be concluded, because he cannot produce that evidence ? If he has lost the evidence, by lapse of time, or accident, it may be supplied by legal presumption. It is not pretended, that this was not a *bona fide* conveyance, for a valuable consideration ; and there are facts and circumstances sufficient to support the presumption. At most, there has been an omission only of a mere legal formality. The presumption required is to support a right. The deeds were put on record, and a deduction of title is recited in them, and they might have been seen by *A. B.* or her heirs ; but no act has been done by her, or those claiming under her, until 1815, questioning the validity of the deed from her. The other claimants

under the patent, by their deeds, to *Degroff*, in 1768, ac-
knowledge the defendant's title. No matter, though they
were released in severalty ; they were all founded on the va-
lidity of the deed of *A. B.* Possession taken under those
deeds, was possession against her and her heirs, and they
say nothing. This amounts to an acquiescence. Again ;
in 1769, commissioners were appointed to make partition,
and notice of their proceedings was published, in the ga-
zette, according to the act. This was a statute notice to
all the world. Surveys were also made, and surveyors en-
tered on the lands under the defendant, yet nothing, during
all the time, was said by any of the lessors, or their ancestors.
It is fair, then, to presume, that they knew, or believed, that
the right of *A. B.* was vested in *Fauconier.* There was,
afterwards, a subdivision made, and releases executed, con-
taining recitals as to the title, which were duly recorded.
Again ; *H. Woodruff* resided in the city of *Albany*, and
practised as a physician there, for thirty years, almost within
sight of the premises, yet preserved a profound silence, as
to any claim, as heir of *A. B.* Surely, under these cir-
cumstances, and after a lapse of more than a century, the
court will presume every requisite formality, as to the ac-
knowledgment of the deed. In *Goodtitle* v. *Duke of Chan-
dos*, (2 *Burr.* 1065. 1072, 1073.) Lord *Mansfield* lays down
the principle of law, as to these presumptions, that where
the presumption, as in this case, is in the nature of *evi-
dence*, it must have *some ground* on which it is to be found-
ed. As if a man have a *power* to suffer a common recovery,
every thing will be presumed to have been done rightly and
regularly, until the contrary appears. So, if a person in-
terested to *object* to a recovery, has had an opportunity to
make objections, but, instead of doing so, has acquiesced
under it, this affords a presumption that all was right and
regular. (*Elridge* v. *Knott, Cowp.* 214.) In *Goodright* v.
*Straphan*, (*Cowp.* 201.) it was held, that a re-delivery by a
wife, after the death of her husband, of a deed delivered by
her when *covert*, was a sufficient confirmation of such deed,
so as to bind her, and that *circumstances* alone were equi-
valent to such a re-delivery. Even an act of parliament

may be presumed ; and a deed, or grant, is often presumed, not because the court believe that any deed ever existed, but for the sake of quieting possession. (*Cowp.* 102. 215. *Jackson* v. *M'Call*, 10 *Johns. Rep.* 377. 380.) " It is," says Lord *Erskine*, (*Hillary* v. *Waller*, 12 *Vesey*, 266.) " because there are no means of creating belief or disbelief, that such general presumptions are raised upon subjects of which there is no record or written muniment. Therefore, upon the weakness and infirmity of all human tribunals, judging of matters of antiquity, the legal presumption holds the place of particular and individual belief." (*Phillips' Law of Ev.* 170.) The recitals in the deeds, it is true, show that we derive our title from *Ann Bridges* ; but they state, also, that the grantors acquired, by lease and re-lease, in 1711, and by subsequent mesne conveyances, a valid title. It is not true, that nothing short of a *pedis possessio*, will support the presumption of the existence of a deed, or grant. Acts of ownership on one side, and notice of them, and acquiescence on the other, are sufficient. The presumption is raised for the furtherance of justice, and for the sake of peace. Acquiescence in acts calculated to impress the idea of a conveyance of title, or ownership, has a tendency to deceive, and to lull third persons into a belief of the fact. On this principle, it has been decided, that if a person, having a title, or claim to land, stands by and sees a stranger convey it, without making known his claim, he is concluded by his silence. In the case of *Jackson, ex dem. Livingston,* v. *Schutt,* decided in 1796, and affirmed in the court of errors, (3 *Johns. Cas.* 118, 119.) this doctrine was settled ; and, that possession may be shown, not merely by a visible fence, but by acts of ownership, applicable to the nature of the property. Where a person has a colour of title, and enters under a deed, an entry into part, will be deemed an entry into the whole. An actual inclosure, or *pedis possessio*, of the whole, is not necessary. Now, here are surveys, deeds of partition, entries, and acts of ownership, on the part of the defendant, and those under whom he claims, for above 50 years past. (12 *Co.* 5. *Van Dyck* v. *Van Beuren,* 1 *Caines*, 84. 91. *Jackson* v. *Demarest*, 2 *Caines' Rep.* 382. *Jackson* v. *Walsh*, 3 *Johns. Rep.* 226. *Roe* v. *Ireland*, 11

*East*, 280. *Goodtitle* v. *Baldwin*, 11 *East*, 488. *Bergen v.*
*Bennet*, 1 *Caines' Cas. in Er.* 1. 1 *Hay. N. C. Rep.* 61.
2 *Hay. N. C. Rep.* 345.) Again; a conveyance in fee, by
a *feme covert*, is not absolutely void. Lord *Mansfield*, in
*Goodright* v. *Straphan*, admitting the distinction between
deeds in fee and leases, says, the exception was allowed for
the advancement of agriculture and tillage ; that the court
ought to look into the substance of the deed ; that it is in
substance a *mortgage*, though in form a lease for years;
that the wife was bound by it, and her subsequent acts set
up the mortgage against her. His argument, however, is
more subtle than sound ; if the deed was a nullity, and void,
how could it be confirmed, so as to operate *ab initio ?* He con-
cedes the doctrine, that the deed of a *feme covert* may be con-
firmed. (*Cowp.* 201. *Wotton* v. *Hele*, 2 *Saund.* 180. n. 9. *Roupe*
v. *Atkinson, Bunb.* 162, 163. *Brooke Ab. Accept.* 6. 2 *Roll.*
*Ab.* 26. pl. 2. *Jackson* v. *Murray*, 7 *Johns. Rep.* 5—11.
*England* v. *Slade*, 4 *Term Rep.* 682.) If necessary, there-
fore, a release from *Ann Bridges*, after she became *disco-*
*vert*, or from her son, *John Hunloke*, or from his grandson,
*Hunloke Woodruff*, may be presumed.

3. The lessors of the plaintiff are barred by the covenant
of *warranty*, in the deed from *J. Hunloke* and wife, to *Fau-*
*conier.* The deed contains full covenants on the part of
the grantors and their heirs, and the title set up by the
lessors, is by descent from the heir of the grantors. (*Co.*
*Litt.* sec. 711, 712.2 *Bl. Com.* 301. 306. *Gilb. Tenures*, 133.
12 *Mod.* 512. *Vaughan*, 366. 7 *Bac. Abr.* 234. *Cruise's*
*Dig. Tit.* 32, *Deed*, ch. 4. sec. 9—29. 4 *Dallas*, 168.
2 *Roll. Abr.* 786. 787. pl. 1. *Co. Litt.* 265. sec. 446. 1 *Ld.*
*Raym.* 779. *Saunders on Uses*, 332—369.) The counsel
here entered at large into the law as to collateral war-
ranties, and contended, that it was in force in the colony,
until the *act for the amendment of the law*, passed the 8th of
*March,* 1773, (*Van Schaack's* edition of laws, 767. 770.
See, also, stat. 4 *Anne*, c. 16. s. 21. 1 *N. R. L.* 525. sess.
36. ch. 56. s. 26.) when collateral warranties were abolish-
ed ; but as the court did not take notice of this point, it is
unnecessary to state the argument further.

4. The deed of 1711, by *J. H.* and *Ann Bridges*, was
confirmed and made valid by the act of the colonial legisla-

ture, passed the 16th of *February*, 1771. The *preamble* gives a precise description of the case before the court. The act is declaratory and remedial. It is a statute of peace, made in favour of *bona fide* purchasers. It ought, therefore, to be construed liberally. The second section, providing a mode, in future, for the proof and record of deeds, shows, that before that time there was no statute regulation, or settled rule, on the subject. But it is said, that this act was void, on general principles, as contrary to the charter of liberties of the province and *magna charta*. This is very delicate ground. The greatest caution ought to be observed in questioning any of these old colonial acts, on which so many titles to property, in this state, now rest. How many titles depend on the acts for confirming partitions, however informal or imperfect? In *Van Schaack's* edition of the laws, (p. 31.) is a remarkable act, passed the 12th of *May*, 1699, for vacating certain patents, granted by Governor *Fletcher*, declared to be extravagant. In 1782, and 1786, acts were passed abolishing entails. (Sess. 6. ch. 2. Sess 9. ch. 12. 1 *Greenl.* ed. of Laws. 205, 206.) Did not these acts equally interfere with vested rights?

Next, as to the power of the colonial legislature to pass such an act. The constitution of the state, (art. 35.) declares what shall be the law of the state; that is, "such parts of the common law of *England*, and the statute law of *England* and *Great Britain*, and of the acts of the legislature of the colony of *New-York*, as together, formed the law of the colony on the 19th of *April*, 1775," &c. The framers of the constitution recognize and adopt these colony laws; they never meant to re-enact them. An act of the colonial assembly, with the assent of the King of *Great Britain*, had all the omnipotence of an act of parliament. *Magna charta* even is subject to the power of the parliament. In *Great Britain* the absolute sovereignty is in the parliament. It can do no wrong. (*Co. Litt.* 110. *a.* 4 *Inst.* 36. 1 *Bl. Com.* 51. 90. 160. *Wood's Inst.* 455. 2 *Bac. Abr.* 109. 5 *Com. Dig.* 220.) Where are we to look for the constitution of the colony? Surely not in the charter of liberties granted by the Duke of *York*. Even that declares that no man shall be disseised except by the judgment of his peers,

and *the law of the province.* Whence did courts of jus-
tice derive their powers. From the common law—from
custom and usage; but the common law may be alter-
ed by statute. In *Jackson* v. *Catlin* the act was a pri-
vate, not a public act, and passed at the instance of
the parties. The *British* parliament, notwithstanding *mag-
na charta,* may exile their subjects, and pass acts of attain-
der and forfeiture. After the constitution of the state was
adopted, and the bill of rights declared, the legislature pass-
ed bills of attainder, and abolished entails. The council of
revision (*Const.* art. 2.) was intended to check improvident
and unadvised acts of the legislature; yet, if two-thirds of
the legislature adhere to an act, it becomes a law, notwith-
standing the objections of the council. If, then, an act of
the colonial legislature, when assented to by the king, has
the force and effect of an act of parliament, how can it be
impeached or questioned, though it devests a vested right?
A similar legislative power was exercised in all the colonies.
(*Laws of Maryland,* 1715. ch. 47. *Laws of North-Caroli-
na,* p. 143. *Laws of South-Carolina,* 132. *Acts of Georgia,*
63. *Laws of Connecticut,* 265. *Laws of Delaware,* 144. &c.)
This was a subject of legislative provision in all of them, for
quieting possessions and securing *bona fide* purchasers; and
we have no evidence of these acts having been questioned
in the courts of the several states. But if, as we contend,
the deed was valid, *A. B.*, or her heirs, had no vested right
in the land, for she had conveyed it away; and the ancestors
of the lessors have acquiesced in the statute for above 40
years. The act did no more than courts of justice often
do, by the aid of presumptions, to quiet possession.

Again; it is said that the act must be strictly construed; but
being beneficial and remedial, it ought to be liberally ex-
pounded. (6 *Bac. Abr.* 374. 388, 389.) Here has been an
adverse possession of part, under a claim of title to the whole,
for about 60 years; a progressive series of acts of own-
ership and possession to this day, hostile to all notion of a
title in the lessors of the plaintiff or their ancestors. All
these amount to actual possession within the meaning of the
act. The defendant may avail himself of the acts of his
co-tenants; the partition commenced in 1769, when the

whole tract was surveyed under the direction of the sur-veyor-general, and the record of partition was filed the 24th of *January*, 1771, in the office of the secretary of state. In 1771, most of the land in the western and northern parts of the state was wild and unoccupied, lying wholly in grant; and if the objection here made is to prevail, most of the titles to lands in those parts of the state will be shaken.

*Henry*, in reply. 1. It is said, that this being a conquer-ed country, the common law of *England* was not in force here, unless specially introduced by some ordinance or sta-tute. *Blackstone* (1 *Com.* 107.) lays it down, that if an un-inhabited country be discovered and planted by *English* subjects, they carry with them all the laws of *England* which are applicable to their situation. But in conquered, or ceded countries, that have already laws of their own, they remain until expressly changed. This was not, in fact, an uninhabited country when first discovered. It was pos-sessed by the native Indian tribes. The *aborigines* having been conquered by the *European* adventurers, the laws of the *Iroquois*, according to the argument of the defendant's counsel, must have prevailed. Again; if conquered from the *Dutch*, then the *Dutch* law must have continued in force. But the fact is, that the *American* colonies were held by right of *discovery*, and not by conquest; and Judge *Tucker*, in ex-cepting *New-York*, is mistaken in point of fact. *Sebastian Cabot*, in the service of *Hen.* VII., discovered the country in 1497, from the 38th to the 68th degree of north latitude, and grants were made under the north and south *Virginia* patents, from the 34th to the 45th degree of north latitude, long prior to the discovery, by *Hudson*, of the river which bears his name, and before the *Dutch* settlement. The *Dutch* were *intruders;* the civil wars in *England* alone prevented the government of that country from immediate-ly expelling them; and the colonists of *New-England* were not in a situation to exert themselves against their new neighbours. The *fact* is, contrary to all theory and specula-tion, that the *English* came into possession in full sovereignty, and that the laws of *England* have prevailed here from the beginning; not all the laws of *England*, but such as were

applicable to the situation of the colony.   Such, for exam-
ple, as the law of *descents*, the law as to *baron* and *feme*, &c.
Whence did the colonists derive their criminal law, and
their modes of trial?  Nay, *English* statutes operated in the
colony, and were acted upon long before any re-enactment
of them by the colonial legislature.   Such were the statutes
of *uses*, for *abolishing the feudal* tenures ; concerning *wills*,
and the *distribution* of intestate's estates ; concerning *frauds*,
*distresses*, *rescue*, *execution*, *escape*, *juries*, *heirs*, and *ances-
tor*, and many other statutes which might be mentioned ;
all of which were in force, though not re-enacted after
the *Dutch* were conquered.   A few of the statutes were re-
enacted in 1772, to remove obscurity ; but it was not until
1778 that the legislature began to re-enact various *English*
statutes, for the purpose of removing all inconvenience and
doubt as to which of them were in force.   The constitution
speaks of the statute law of *England* and of *Great Britain* as
being the law here, that is, the *English* law before the re-
volution, and the *British* law since.   The act for revising
and digesting the laws of the state, passed the 15th of *April*,
1786, (1 *Laws of N. Y., J. & V's* ed. 281.) after reciting
this clause of the constitution, directed that all such statutes
of *England* and *Great Britain*, as were a part of the law of
the colony on the 19th of *April*, 1775, should be brought in,
in the shape of bills, to be enacted.   In this form the statute
of 6 *Edw*. I. c. 3. (omitting only the clause respecting as-
sets,) the statute of 32 *Hen*. VIII. c. 28., and 4 *Anne*, c. 16.
s. 1. were enacted, thereby affording, by necessary implica-
tion, the sense of the legislature, that they extended to the
colony ; though the 6 *Edw*. I. c. 3. and 32. *Hen*. VIII. c.
28., were never enacted by the colonial legislature.

  The *common law* of *England*, then, being in force here,
*Ann Bridges*, a *feme covert*, could not convey her estate by
such an acknowledgment as that made of the deed of 1711.
The deed, as to her, is absolutely void.   (1 *Bl. Com.* 444.
*Co. Litt.* 326. *a.*)   The rule of the common law is founded
in sound policy ; there could be no good reason for not
adopting it here ; and it was expressly adopted in the charter
of liberties, which does not appear to have been repealed.
If there was any exception, in this respect, to the common

law rule, it lies on the defendant to show that exception. The lessors of the plaintiff are entitled to the full benefit of the common law. If there was a law or usage of the colony, as mentioned in the preamble to the act of 1771, of taking the acknowledgment or proof of deeds before a member of the king's council, a judge of the supreme or county court, or a master in chancery, it lies with the defendant to show that any other officer might take the acknowledgment, and that a bare acknowledgment, without any private examination, before a justice of the peace in *New-Jersey*, was sufficient. The certificate of acknowledgment is given by a justice of the peace of *Essex* county, (*N. J.*) who states merely that the parties appeared *to acknowledge*; not that the wife was privately examined by him, whether she executed the deed voluntarily. It is true, the court will look at the usage or practice of the colony, but there must be *evidence* of such usage or practice. A particular case does not prove usage. The practice must be general, before the maxim of *Communis Error facit Jus*, can apply.

2. The act of 1771, we repeat, was void. The colonial legislatures were limited in their powers. (1 *Bl. Com.* 107 —109.) The right of property is an inherent right; it is declared, says *Blackstone*, by the great charter, that no freeman shall be disseised or devested of his freehold, or of his liberties, or free customs, but by the judgment of his peers, or by the law of the land, which *Coke* says, means by process of law. (2 *Inst.* 53. note 8.) Private property cannot be taken without the owner's consent. (1 *Bl. Com.* 138, 139.) Our bill of rights is copied from *magna charta*. (4 *Bl. Com.* 423, 424. 1 *N. R. L.* 46.) As to the acts passed in the other colonies; if they were arbitrary and unconstitutional, they afford no authority or precedent for us. Besides, it will be found that in all the other states, they proceeded on usage, and the private examination of the wife was indispensable.

In *Davey* v. *Turner*, (1 *Dallas*, 11.) there was a private examination of the *feme covert*, and an *usage* of above fifty years, was found by the special verdict. Again; in *Lloyd* v. *Taylor*, (1 *Dallas*, 17.) the constant *usage* of the province appeared in evidence. So, in *Watson* v. *Bailey*, (1 *Binney*, 470.) there was a private examination, and an act of the co-

lonial assembly of the 24th of *February*, 1770, as to usage, was given in evidence ; and in *Fowler* v. *Shearer*, (7 *Mass. Rep.* 14—18.) Ch. J. *Parsons* puts it on the ground of *immemorial usage*, and provincial regulation. The defendant, in this case, ought, in like manner, to have given evidence of the usage, if he intended to rely upon it.

Again ; the conveyance is by *lease* and *release*, which operates only by virtue of the statute of uses, under which nothing passes, but what the grantor has a right to convey, and actually does convey. (*Sanders on Uses*, 378. 4 *Cruise's Dig.* 112. tit. 32. ch. 6. s. 43—47. *Id.* tit. 32. ch. 13. s. 16.) If a tenant for life, alienes by feoffment, it is a forfeiture of his estate ; not so, if he conveys by lease and re-lease ; for a conveyance by the statute of uses does not produce a *disseisin.* The husband cannot disseise the wife. (2 *Bac. Abr. Discontinuance*, C.) *De Groff* and *Groat* were in possession of two small lots, separately. A possession of a nook or corner of the patent cannot operate as a possession of the whole. *De Groff* entered only for a part, and his entry is for his right, and co-extensive with it. A possession which is to countervail the legal title, must be a *pedis possessio*, a real and substantial inclosure, an actual occupancy, definite, positive and notorious. (*Jackson* v. *Schoonmaker*, 2 *Johns. Rep.* 280.) There can be no extension of possession by construction, where it is against the right owner. The partition, under the colonial act, was only according to the rights of the parties ; it can have no effect on the rights or claims of third persons. There was, then, no *actual* possession ; and so the statute does not apply.

Again ; it is said, we should have asserted our right by actual entry ; but an actual entry is not necessary, except to avoid a fine. (*Doug.* 483.) Admitting, even, that the wife was disseised, no actual entry was necessary, in order to maintain this suit. The *third* section of this act shows what the legislature meant by actual possession. It speaks of actual possession by a purchaser for twenty years past.

Next, we are told that we are bound by the *collateral warranty.* The defendant's counsel deny that the common law was in force in the colony ; and yet set up the doctrine of

ALBANY,
January, 1818.

JACKSON
v.
GILCHRIST.

collateral warranty to bar the plaintiff. Where is this doc-trine to be found, but in the ancient common law of *England*? But, we repeat, the colonists not only brought with them the common law, but all the statutes passed to meliorate that law, and to adapt it to the progressive improvements of society; and wretched would have been their condition, in many respects, without the benefit of those remedial statutes. Collateral warranties were considered in *England* as a great grievance; and as early as in the 50 *Edw.* III., the commons petitioned the king to declare that no warranty should bar, unless where assets descended from the warranting ancestor. The statute of *Gloucester*, 6 *Edw.* I. ch. 1. had been already passed, which declared, that if a tenant by the curtesy aliened the estate which he held by the curtesy, with warranty, his heir should not be barred by such warranty, unless he inherited lands of equal value from his father. By this statute, then, the collateral warranty, in this case, would be defeated, unless the ancestor of the lessors had assets, which does not appear, but the contrary has been shown by the defendant. (2 *Inst.* 291. 1 *Inst.* 365. a. 4 *Comyn. Dig. Guaranty*, *H.* 5. 4 *Cruise's Dig.* 56. tit. 32. ch. 6. s. 18, 19.) Besides, the statute of 4 *Anne*, c. 16. s. 21. which abolished collateral warranties, was in force in the colony, though not re-enacted until 1773, and then from motives of policy, merely, and to remove all doubts on the subject. Our statute (sess. 24. ch. 169. s. 7. 1 *N. R. L.* 183.) is a re-enactment of the stat. *Gloucester*, leaving out the clause as to assets, so that no collateral warranty whatever, or in any case, could bar the issue of the inheritance of the mother. This shows the sense of the legislature as to these collateral warranties. The counsel proceeded in answer to the defendant's counsel, as to the nature and effect of the collateral warranty; but it is unnecessary to state his argument further.

Again; the defendant, and those under whom he claims, entered under the deed, and so under the husband, and co-extensive only with his right; and as his estate ceased at his death, they were only tenants by sufferance, and could not destroy that relation, except by an actual dissei-sin. Then the case of *Jackson* v. *Sears*, (3 *Johns. Rep.* 433.) applies. There *A.* entered into possession of land,

and afterwards received a deed from his father and mother, but which was not acknowledged by the mother, to whom the land belonged; it was held, that the acceptance of the deed repelled the evidence that he entered adversely to the title of his mother, and he was deemed to hold, under the deed, his father's estate only, for life; and on his death, the land reverted to the mother and her heirs. (*Jackson v. Parker*, 3 *Johns. Cas.* 124. *Jackson v. Sharp*, 9 *Johns. Rep.* 163.)

Next, as to the presumptive evidence : the principle is, that " Long and undisputed possession of any right or property, affords a presumption that it had a legal foundation, and rather than disturb men's possessions, even records have been presumed." (2 *Peake's Ev.* 22.) *Omnia præsumuntur solemniter esse acta.* Where there had been uninterupted possession for ages, a grant from the crown was presumed. (12 *Co.* 5. *Bedle v. Beard.*) But these presumptions are allowed only to make out a defendant's title against third persons, (1 *Caines,* 84. *Jackson v. Woolsey,* 11 *Johns. Rep.* 456.) not against a clear derivative title. The presumption is founded on actual possession, which must accompany and go along with the deed. In *Palmer v. Hicks,* (6 *Johns. Rep.* 135.) the court say that they will not presume a grant of land under navigable water to the owner of the adjacent soil, without evidence of long exclusive possession and use to warrant it. In the cases cited by the other side, the usage was considered as evidence of a grant, or agreement; but this evidence may be repelled by showing that the usage was limited, &c. (*Phillips' Ev.* 120, 121.) The usage which is supposed to be founded on a grant, or agreement, determines also the *extent* of the supposed grant. The right granted is considered as commensurate with the right enjoyed. (*Phillips' Ev.* 124. 4 *East,* 339, 340.) There is no such evidence in this case. No adverse possession whatever has been shown prior to 1787. (*Jackson v. M'Call,* 10 *Johns. Rep.* 377. 380. *Jackson v. Lunn,* 3 *Johns. Cas.* 109. 118.)

Time, or antiquity of title, is nothing, without a possession going along with it. (2 *Peake's Ev.* 110. (112, 113.) *Bull. N. P.* 255.) There can be no presumption against a clear

JACKSON
v.
GILCHRIST.

title deduced from the government, short of an actual possession for 20 years. The presumption is admitted only in aid of a defective title. Multiplied presumptions cannot avail any thing, unless founded on actual possession. A deed 100 years old is nothing without possession. The mere record of a deed, for the sake of preserving the evidence of title, is no notice, though a registry, made necessary to support title, is so. A survey of land is not evidence of possession. Every presumption may be rebutted by other evidence; by parol evidence, or any kind of proof which goes to destroy it. (*Runn. Eject.* 284.) Presumption arises from acts, not from non-feasance. There is no evidence of any acts done by *A. Bridges* to raise a presumption. Again; presumptions are to supply facts about which there is no proof. Now, here the deed itself is produced, and the court are called upon to presume that deed to be a legal and perfect conveyance. They produce a defective deed, and ask that it be presumed good. If the deed had not been produced, there might have been some reason for presuming every thing in its favour. In *Jackson* v. *Vosburgh*, (9 *Johns. Rep.* 270.) the court say, that the possession, in common, had existed so long, that a title, in common, might have been presumed, had not the defendant shown a will as the source from whence he derived title; and that being abandoned, the door was shut against presumption in favour of any other title.

THOMPSON, Ch. J. delivered the opinion of the court.

The lessors of the plaintiff derive title under *Ann Bridges*, who was one of the original patentees; and their right to recover is made out, unless the title of *Ann Bridges* has been devested, by her own act, in conveying it away, or the right to recover in this action has been lost by lapse of time. The vast amount of property, involved in the questions to be settled by this case, has increased their interest, and has drawn forth from the counsel, on the argument, a very able and elaborate discussion. The conclusion to which the court has arrived, and the point on which the decision is unanimously placed, has rendered it unnecessary for me to

notice many of the questions which were brought under examination on the argument.

It is contended, on the part of the defendant, that *Ann Bridges*, who had intermarried with *Joshua Hunloke*, parted with her title by the deed, executed by her and her husband, to *Peter Fauconier*, bearing date the 12th day of *February*, 1711. It is objected, however, on the other side, that this deed was not acknowledged in such a manner, as to devest the title of a *feme covert*. The acknowledgment purports to have been made before *John Blanchard*; and his certificate, endorsed on the deed, is in these words: " This day came before me, one of his majesty's justices for the county of *Essex*, the within mentioned *Joshua Hunloke*, and *Ann* his wife, to acknowledge this indenture to be their acts and deed, this 19th day of *February*, 1711. *John Blanchard*." In the deed, the grantors are described as of *Elizabeth-Town*, in the province of *East New-Jersey*, and the grantee as of the city of *New-York*. At the time this acknowledgment was made, we had no colonial act on the subject. This has given rise to a very interesting discussion of the question, how far we were governed and controlled by the common law, in the acknowledgment of deeds by *femes covert*, and by which a *feme covert* could be devested of her title only by fine, or some matter of record; and on which proceeding she was required to be examined privately, or by the court, to ascertain whether she has parted with her estate freely, and without compulsion from her husband. But there being some diversity of opinion on the bench, how far the common law mode of proceeding was at that time in force here, it has been thought unnecessary, at present, to decide that point. It may, however, I think, be assumed, that, in point of fact, and as matter of practice, the common law, in this respect, has never been adopted with us; and it may not be amiss, briefly to observe, that, in some of our sister states, which were *British* colonies, and equally with us subject to the common law, the mode of acknowledgment adopted in this case, has been substantially recognised and sanctioned. In the case of *Davey and Wife* v. *Turner*, (1 *Dall.* 11.) decided in the supreme court of *Pennsylvania*, as early as the year 1764, it

was placed on the ground of *usage* and custom, and the maxim, *communis error facit jus*. The force and effect of such usage was again noticed in the case of the *Lessee of Watson* v. *Bailey*, (1 *Bin.* 470.) where *Yates*, J. very justly observes, that the maxim just alluded to, had great weight, when the most injurious consequences would flow from counteracting it. Lord *Coke* says, (2 *Inst.* 28.) usage has prevailed, even against *magna charta*. In the supreme court of *Massachusetts*, Ch. J. *Parsons*, in the case of *Fowler* v. *Shearer*, (7 *Mass. Rep.* 20.) speaking of an usage in that state, as to conveyances by married women, says, that estates never have there been conveyed by fine, in which the wife might be examined, and, by her consent, be barred by the fine ; that whatever was the origin of the usage, it could not be disallowed, without shaking very many of the existing titles to real estates ; and that it must now be considered as the law of the land. But, as the decision of the case before us is placed entirely upon the colonial act of 1771, (*Van Sch. ed. Laws*, 611.) it is unnecessary for me further to notice the usage on this subject, or to inquire how far we were then bound by the common law. I have barely referred to some cases that have arisen in other states, where a similar usage has been sanctioned, to show that the common law mode of conveyance, by fine, was not in practice there, nor, most likely, in any of the *British American* colonies. What part of the common law of *England* was in force here, before the *American* revolution, has been a subject of very considerable doubt and difficulty ; (*Smith's Hist. of N. Y.* 372. 381.) and is not now intended to be decided.

The colonial act to which I have referred, purports to be an act to confirm certain ancient conveyances ; and recited that, " whereas it has been an ancient practice in this colony to record deeds concerning real estates upon the previous acknowledgment of the grantors, or proof made by any of the subscribing witnesses before a member of his majesty's council, a judge of the supreme or county court, or a master in chancery, and sometimes before a justice of the peace. And, whereas, there are lands and tenements held under the deeds of *femes covert*, not acknowledged in manner aforesaid, and yet made *bona fide*, and for valuable consideration,

the purchasers whereof, and those holding under them, ought to be secured, both in law and equity, against the respective grantors, their heirs and assigns. It was, therefore, enacted, that no claim to any real estate, whereof any person is now actually possessed, whether as tenant in common, or otherwise, shall be deemed to be void, upon the pretence that the *feme covert* granting the same, had not been privately examined before any of the public officers or magistrates aforesaid." The act, then, proceeds to direct the manner in which deeds, thereafter to be made, should be acknowledged and recorded. The provisions of this act apply so directly to the deed in question, that all objections to the title derived under it must cease, unless the act itself can be got rid of. The inference drawn by the counsel from the form of the certificate of acknowledgment, (that the parties came before the magistrate *to* acknowledge, &c.) that no acknowledgment, in fact, was made, cannot be correct. An acknowledgment was deemed necessary, and the parties went before the officer for the purpose of making it; and it would be a most unreasonable conclusion, that it was not, in fact, done. The officer could hardly have been guilty of so absurd and nugatory an act, as to give a formal certificate, that the parties came before him *to* acknowledge the deed, if they did not actually acknowledge it. Nor are we to conclude, that because the certificate does not state a private examination of the wife, that no such examination took place. After such a lapse of time, this might, and ought to be, presumed; especially as there was no statute in any manner prescribing the form of the certificate. But the act of 1771 meets the case, and declares that the estate shall not be deemed to be void, upon the pretence that the *feme covert* granting the same had not been privately examined before the officer. It is not necessarily to be inferred from this provision, that it applied to cases where no private examination had, in fact, been made. The act was intended to confirm ancient conveyances, and to prevent the want of evidence of a private examination being set up to avoid the deed, presuming the evidence of the fact to be lost by the lapse of time. Had it been intended to make good a deed

where no private examination at all had taken place, it would, probably, have been so declared in terms, and not have spoken of this defect as a *pretence*, which, by no means, necessarily implies an admission of an entire omission of such examination. This construction is strengthened by the provision in the next section, that in all acknowledgments, thereafter, the officer taking the same shall set forth, in his certificate, that the wife had been privately examined, and confessed that she executed the deed freely, without any fear or compulsion of her husband. Assuming, then, that a private examination was, in fact, made, though omitted to be set out in the certificate, the great object in view at the common law has been answered, to wit, to ascertain whether the wife acted under fear or compulsion. In a conveyance by common recovery, the *feme covert* was not examined privately, she being in court, or presumed to be there. The examination of the judges destroyed the presumption of the law, that she was acting under the coercion of her husband. (10 *Coke*, 43. 2 *Roll. Abr.* 395.)

Several objections have been taken to this act, however, which it is necessary to notice. It is said to be against the express provisions of the *Charter of the Duke of York* of 1683, which declares that no estate of a *feme covert* shall be sold or conveyed, but by deed acknowledged by her in some court of record, the woman being secretly examined, if she doth it freely, without threats, or compulsion of her husband. (2 *N. R. L. App.* IV.) If this charter was in force here when the acknowledgment in question was taken, and when the act of 1771 was passed, there would be weight in the objection; but, I believe, it has been the general, if not the universally received opinion, that this charter was not in force here after the revolution of 1688. In the journals of the general assembly of *New-York*, of the 24th of *April*, 1691, we find the following proceedings:

" Upon an information brought into this house by several members of the house, declaring, that the several laws made formerly by the general assembly, and his late royal highness, *James*, duke of *York*, &c. : and, also, the several ordinances, or reported laws, made by the preceding governors and council, for the rule of their majesties' subjects within

this province, are reported, amongst the people, to be still in force : resolved, *nemine contra dicente*, that all the laws consented to by the general assembly under *James*, Duke of *York*, and the liberties and privileges therein contained, granted to the people, and declared to be their rights, not being observed, and not ratified and approved of by his royal highness, nor the late king, are null, void, and of none effect; also the several ordinances made by the late governors and councils, being contrary to the constitution of *England*, and the practice of the government of their majesty's other plantations in *America*, are, likewise, null, void, and of none effect, within this province." (1 Vol. *Journals*, 8.) We do not find this charter published in any edition of the colonial laws, as we most undoubtedly should, had it been considered in force. By a resolution of the general assembly of the 12th of *November*, 1709, (1. Vol. *Journals*, 267.) Mr. *Bradford* is directed to print all the acts of the general assembly of the colony then in force since the arrival of Col. *Stoughton*; (*January*, 1689.) and the charter of the Duke of *York* would, undoubtedly, have fallen within the scope and purview, if not within the letter of this resolution; for that charter purports to be enacted by the governor, council, and representatives, in general assembly, and by the authority of the same. That the charter of the Duke of *York*, as such, was not considered in force after the revolution of 1688, is very obvious; because the general assembly of the colony, in 1691, passed an act declaring what are the rights and privileges of their majesties' subjects inhabiting within the province of *New-York*, in which many of the provisions in the charter of the Duke of *York* are incorporated, and, doubtless, all that were intended to be in force; among others, the very provision relative to conveyances by *femes covert*. (*Brad.* edition of the laws, 2. 5.) But this act was repealed by the king on the 11th of *May*, 1697, as appears by a marginal note in *Van Schaack's* edition of the laws, (p. 5.) and which was made pursuant to the authority given him by the act of 1772, (*Van Schaack's* edition of the laws, 676.) appointing him to revise and digest the laws of the colony. The charter of the Duke of *York* not being included in this revision, affords irresistible evidence, that it

was not deemed to be in force here; for he was authori-zed and required to revise, digest, and cause to be printed, all the laws, from the happy revolution, down to the end of the then session, (1772.) From this view of the acts and proceedings of the colonial legislature, we may very safely conclude, that in 1711, when the acknowledgment in question was taken, there was no charter, or statute regulation on the subject in force here; but that a loose and unsettled practice prevailed, as is set forth in the recital to the act of *February*, 1771. It, therefore, became highly necessary and proper, that what had been done under such usage, or practice, should receive legislative sanction.

It has also been contended, that this act interfered with the vested rights of the heirs of *Ann Bridges;* and, on this ground, ought to be declared null and void. Without entering into the question, of the authority of the court to set aside the act altogether, it is certainly a delicate power, and ought to be exercised cautiously, and in extreme and palpable cases only. We do not consider the one before us as one of that class. It is an act, confirming and quieting the title of *bona fide* purchasers, and sanctioning an ancient custom, as to the form of acknowledgment. Such an act ought to receive a liberal and benign interpretation, for the purpose of securing titles derived under such deeds. In *Jackson* v. *Schoonmaker*, (2 *Johns. Rep.* 234.) this court, in speaking of the loose manner of taking the proof of deeds, prior to the act of 1771, say, that the practice in the colony before that time, is, undoubtedly, to be regarded on a question, touching the authority and validity of an ancient deed. By the custom, in some cities and boroughs in *England*, a bargain and sale, by the husband and wife, where the wife is examined by the mayor, or other officer, binds the wife, after the husband's death. (2 *Inst.* 673.) By the statute 34 *Hen.* VIII. ch. 22. all such customary conveyances are declared to be of force, notwithstanding the statute, 32 *Hen.* VIII. ch. 28. which required the conveyance to be by fine, levied by the husband and wife. The statute 34 *Hen.* VIII. refers to, and sanctions certain customs, which had existed in some cities, boroughs, and towns, as to taking and acknowledging deeds; and declares that the same shall stand,

any thing in the act of 32 *Hen.* VIII. to the contrary not‑
withstanding.   So there is a custom in the town of *Den-*
*bigh,* in *Wales,* that a *feme covert,* with her husband, may
aliene her land there, and it shall bind the wife, and her
heirs, as a fine does.   This custom is not taken away by the
statute of *Wales,* 27 *Hen.* VIII. ch. 28.   Because, as is
said by the court, the custom is reasonable, and agreeable
to some customs in *England,* for the assurance of purcha-
sers. (*Dyer,* 363.)   Thus, we see, that, in *England,* certain
customs, as to acknowledgments by *femes covert,* have been
recognised and sanctioned by acts of parliament, notwith-
standing such customs were contrary to the course of the
common law.   But this colony act receives very considera-
ble strength and confirmation, from the 35th article in our
constitution, (1 *N. R. L.* 41.) which declares, that such
parts of the common law of *England,* and of the sta-
tute law of *England,* and *Great Britain,* and of the
acts of the legislature of the colony of *New-York,* as, to-
gether, did form the law of the said colony, on the 19th
day of *April,* 1775, shall be and continue the law of this
state, subject to such alteration as the legislature shall, from
time to time, make concerning the same.   The act now in
question comes directly within this article; and may fairly
be considered as expressly adopted by the constitution.   It
had very recently been passed, and must have been within
the knowledge of the framers of the constitution, who were
men too enlightened and upright to infringe upon vest-
ed rights.   But this article affords a fair inference also, (if
it had been thought necessary to enter into that question,)
that the whole body of the common law was not considered
in force and operation here; otherwise the article would not.
have spoken of a *part.*   It adopts *such part* of the common
law, which, together with the statute law, did then form the
law of the colony; and how is this to be ascertained?   It
must be, either by showing an express adoption, or an im-
plied one, to be collected from the course and practice of
the courts, and the usages and customs which prevailed in
the government.   As it respects the acknowledgment of
deeds, by *femes covert,* the common law modes, by fine and
recovery, never were in use here.   If it were necessary to

pursue this question further, the act of 1771 might be strongly fortified, by referring to what has taken place in other states, in most of which similar laws have been passed ; and, from aught that appears, have been sanctioned and upheld by their courts of justice.

But it has been argued, that, admitting the validity of the act, no such possession has been shown, as to bring the present case within its provisions. Before noticing the facts in relation to the possession, it will be proper to examine the act itself, and see how broad a construction it will admit. It is, in general, true, that the preamble of a statute is a key to open the mind of the makers, as to the mischiefs which are intended to be remedied by the statute. This rule must not, however, be carried so far as to restrain the general words of an enacting clause, by the particular words of the preamble. (6 *Bac. Ab.* 380, 381.) Although the preamble cannot control the enacting part of a statute, which is expressed in clear and unambiguous terms, yet, if any doubt arises on the words of the enacting part, the preamble may be resorted to, to explain it. (4 *Term Rep.* 793. Sir *William Jones*, 163. *Palm.* 485.) In the preamble to this statute, nothing is said with respect to possession of the land, nor any thing from which it could be inferred, that the act was intended to be confined to deeds for lands in actual possession, at the time of passing the act. After reciting the practice that had prevailed with respect to acknowledgments, it recites that there are lands and tenements held under the deeds of *femes covert*, not acknowledged in manner aforesaid, and yet made *bona fide*, and for valuable consideration. By this it would seem, that the cases intended to be embraced, were those where the purchase was *bona fide*, and for valuable consideration ; that in such cases, the purchasers, and those holding under them, ought to be secured, both in law and equity, against the grantors, their heirs and assigns. The unimproved state of the lands in the colony, at that time, affords a pretty strong argument that the intention of the legislature was to confirm and secure the title in all such cases. To restrict the act to those cases only where there was a *pedis possessio*, would be providing only for a small pro-

portion of the cases probably intended to be embraced; as, comparatively speaking, but a small part of our lands were, at that time, under actual cultivation and improvement. With such a preamble, and taking such to be the situation of the country, let us apply the enacting clause. It declares that "no claim to any real estate whereof any person is now actually possessed, whether as tenant in common or otherwise, shall be deemed void, upon pretence that the *feme covert* granting the same had not been privately examined," &c. If this clause was to be construed without any reference to, or aid from, the preamble, I should think it would apply only to those cases where the land for which the deed was given was in actual possession. But considering the enacting clause with an eye to the preamble, it would be no very strained construction to apply the word *possessed*, to the claim or title, instead of the land itself; and then there would be perfect harmony between the preamble and the enacting clause. But it is not necessary, in this case, to resort to this construction. It has been noticed only for the purpose of showing, that all acts of ownership exercised over the land should be viewed as the acts of one having title, and, therefore, liberally construed, and not as the acts of one setting up a possession in opposition to the title, which are to be construed strictly. It is not denied that a regular and complete paper title has been deduced to the defendant, and those under whom he claims, from *Peter Fauconier*, the grantee in the deed from *Ann Bridges* and her husband. Nor is it pretended that there has ever been any actual possession in hostility to this title; and it is a settled rule of law, that where there is no adverse holding, the possession is deemed to be in him who has title. This doctrine has been extended by this court farther, perhaps, than the *English* rule would admit. In *Jackson* v. *Sillick*, (8 *Johns. Rep.* 262.) it is held, that where a *feme covert* is the owner of wild and uncultivated land, she is considered, in law, as *in fact possessed*, so as to enable her husband to become a tenant by the curtesy. The observations made by the court in that case apply, with peculiar force, to the present. It is said there was no *pedis possessio*, or possession in fact, of the premises, in the popular sense of the words, by the

husband or his wife, during the coverture ; for the lands re-
mained, as new lands, wild and uncultivated, though the title
clearly existed in the wife. The question is, was she not
considered as seised in fact, so as to enable her husband to
become a tenant by the curtesy ? To deny this would be
extinguishing the title of tenant by curtesy, to all wild and
uncultivated land. It has long been a settled point, that the
owner of such land is to be deemed in possession so as to
maintain trespass. The possession of such property follows
the title, and so continues, until an adverse possession is
clearly made out. This is the uniform doctrine of this
court. Adopting this rule of construction, the act of
1771 would be fully satisfied without any acts of ownership
exercised over the land ; but the case before us does not rest
even here ; for, as early as in the year 1768, a part of this
tract, under the title derived from *Ann Bridges*, was sold to
*Lewis Groat*, and actual possession taken of the same,
which has continued down, ever since, under title derived
from him. *Groat*, by his deed, became responsible, and
covenanted to pay the quit rent on the whole patent ; and,
for many years thereafter, he actually did pay the same.
In the same year, about 800 acres more of this tract were
sold to *H. De Groff*, and actual possession taken, and im-
provements made, and it has been ever since held under the
same title. But the partition which was commenced in the
year 1769, and pending, at the very time the act of 1771
was passed, was a still more direct act of ownership exer-
cised over the whole tract. This partiton was made under the
act of 1762, (*Van Schaack's* ed. 403.) according to the pro-
visions of which various acts of public notoriety and owner-
ship were made indispensably necessary. Among others,
a survey of the whole tract to be divided was made. All
this was done without any one appearing to set up or repre-
sent the claim of *Ann Bridges*, upon which the lessors of the
plaintiff now place their right to recover, although public
notice of such proceedings was given in two newspapers,
for twelve weeks, directed to all persons interested in the
tract.

Without entering more particularly into the evidence of
actual possession, we feel perfectly persuaded, that enough

has been shown to bring the present case within the spirit, true intent, and meaning of the act of 1771; and that the defendant is entitled to all the benefit and protection which it affords. Judgment must, accordingly, be rendered for the defendant.

ALBANY,<br>January, 1818.<br><br>LORING<br>v.<br>HALLING.

Judgment for the defendant.

---

HOGHTALING <em>against</em> OSBORN.

IN error on *certiorari* to a justice's court.

The defendant in error brought an action in the court below against the plaintiff in error, and a verdict was found for the defendant in error. It appeared, however, that the verdict was received, and the judgment rendered on *Sunday*.

*Per Curiam.* It was proper to receive the verdict, presuming that the jury were impannelled before *Sunday* commenced; but it was illegal to enter the judgment on *Sunday*, and for that cause it must be reversed.

<em>Where a jury has been impannelled before Sunday commences, their verdict may be received on Sunday; but in a trial in a justice's court, the justice cannot enter judgment on the verdict on that day.</em>

Judgment reversed.

---

LORING <em>against</em> HALLING.

IN error on *certiorari* to a justice's court.

The defendant in error brought an action in the court below against the plaintiff in error, and declared on a note or memorandum given for 24 dollars, on the sale of certain mortgaged premises, pursuant to a notice under the statute.

<em>The word month, when used in a statute, is, if nothing appear to the contrary, to be understood a lunar, and not a calendar month.</em>

The public notice required to be given in cases of sales under powers in mortgages, (sess. 36. c. 32. s. 6. 1 N. R. L. 374.) is sufficient, if published for six successive lunar months previous to the time of sale.

By this note the defendant below promised to pay that sum when the deed was given, provided the proceedings and sale had been regular, pursuant to the statute, and the only question made upon the trial was, as to the sufficiency of the notice, which was dated on the 17th of *February*, 1817, and inserted in a public newspaper the next day, and the sale was on the 7th of *August.* The justice considered the notice sufficient, and, accordingly, gave judgment for the plaintiff below, the defendant in error.

*Per Curiam.* A month in law is a lunar month, or 28 days, unless otherwise expressed; (2 *Bl. Com.* 141.;) and this, as a general rule, is recognised by this court in *Leffingwell* v. *Pierpont;* (1 *Johns. Cas.* 100.) although it is there decided, that it does not apply to bills of exchange, and promissory notes; but that in the computation of time, in relation to those instruments, a month is construed to mean a calendar month. In *Lacon* v. *Hooper,* (6 *Term. Rep.* 226.) it is laid down as a general rule, that when the word *month* is used in a statute, without the addition of *calendar*, or any other words to show that the legislature intended calendar months, it is understood to mean a lunar month. Lord *Kenyon* there expressed a wish, that when the rule was first established, it had been decided that *months* should be understood to mean *calendar*, and not *lunar* months; but observed, that the contrary had been so long, and so frequently determined, that it ought not again to be brought in question. By an act, (1 *N. R. L.* 374.) the notice is required to be inserted and continued, at least once a week, for six successive months previous to the sale, in one of the newspapers, &c. There are no words here to take it out of the general rule, that *month* means lunar month; and this seems to have been the construction given to this statute, in *Jackson* v. *Clark.* (7 *Johns. Rep.* 217.) The sale in that case was decided to be irregular, but no intimation was given that the time was too short; and the notice there was, like the present, computed by lunar months: it was dated on the 17th of *February*, and the sale was on the 12th of *August.* From these considerations it is very clear that the mode of computing the time of notice, required by the statute, must

be by lunar, and not by calendar months; and this being the only question raised on the return, the judgment must be affirmed.

Judgment affirmed.

———◄※►———

## BORDEN against FITCH.

THIS was an action on the case for debauching the daughter and servant of the plaintiff, *per quod servitium amisit.* The declaration contained three counts. The first count was for debauching *Rebecca Borden,* the daughter of the plaintiff, *per quod,* &c. The second count was for enticing from the plaintiff's service, and debauching her daughter, *Rebecca,* for the space of ten weeks, *per quod,* &c. The third count stated, that *Rebecca Borden* resided with her mother, the plaintiff, and greatly assisted her in the business of her family; that the defendant, by falsely representing to the said *Rebecca,* that his former wife was dead, and that he was then unmarried, induced and persuaded her to marry him in case her mother would consent; and to obtain the plaintiff's consent, falsely represented to the plaintiff that his former wife was dead, and that he was then unmarried, by means of which false representation he induced the plaintiff to consent; and the plaintiff, confiding in his representation, did consent, and the marriage was, thereupon, had between the defendant and the said *Rebecca;* whereas in truth, and in fact, the lawful wife of the defendant was then living, and the defendant was not then unmarried, which the defendant well knew; that the defendant, afterwards,

A judgment rendered by a court of another state which has jurisdiction, neither of the subject of the action, nor the person of the defendant, is void, and will not be enforced in the courts of this state.

A judgment rendered in another state against a defendant who never appeared, and had no notice of the proceedings, is void.

A divorce obtained in *Vermont* by a husband from his wife, who resided in another state, and had no notice of the pendency of the proceedings, is void, and will not legalize a subsequent marriage contracted in this state.

A judgment, or decree, obtained on false, or fraudulent suggestions, is void.

It *seems,* that a judgment obtained in the courts of another state, having jurisdiction of the subject of the suit, and in which the defendant has been duly notified to appear, is conclusive in the courts of this state.

Where a count, in a declaration, contains a sufficient cause of action, connected, however, with matter insensible and void, or not actionable, it will be intended, after verdict for the plaintiff, that damages were given only for the part that is actionable, and the judgment will not be arrested.

abandoned the said *Rebecca*, and left her wholly destitute of support, and still does neglect and refuse to maintain and support her; by means whereof the plaintiff has been, and still is, deprived of the service of the said *Rebecca*, who had been rendered unable to maintain herself, or assist the plaintiff; and that the plaintiff had expended divers sums of money, to wit, the sum of 500 dollars, about the nursing and maintaining of the said *Rebecca*. The cause was tried before Mr. J. *Platt*, at the *Orange* circuit, in *September*, 1816.

The defendant, *Stephen Fitch*, was married in 1784, in the state of *Connecticut*, of which he was then an inhabitant, to *Charlotte Sellick*; and they resided together, as man and wife, in the state of *Connecticut*, until some time in the year 1807, when they separated; during which period they had several children. In *September*, 1807, *Charlotte Fitch* presented a petition to the general assembly of the state of *Connecticut*, complaining of the cruel usage of her husband, who had, at various times, beaten her, and threatened to take away her life, and had so terrified her, that she was afraid to live with him, and had fled from his house for protection, and praying to live separately from him, and be divorced from his bed and board, and for a separate maintenance from him, and to have the government and guardianship of her two youngest children. The resolve of the general assembly stated, that the petition had been duly served on the defendant, and that the parties appeared and were heard, and that threats of cruelty of the defendant to his wife were proved: whereupon it was resolved, at the general assembly, held at *New-Haven*, in *October*, 1808, that the petitioner might, at her election, live and reside separately from the defendant, without being subject to his control, and with the privileges of a *feme sole*; and the sum of 150 dollars was ordered to be paid to her annually, by the defendant, for her maintenance, on condition, however, that she should cause the resolve to be recorded in the records of *New-Canaan*, where she resided.

The defendant's wife, after her separation from him, resided constantly in the state of *Connecticut*, and was living during the period of all the transactions hereafter mentioned. The defendant, in 1813, applied to the supreme court of the

state of *Vermont* for a divorce *a vinculo matrimonii*, which
was granted, at the term of that court, held in *August*, 1813.
The record of the decree of the court contained the fol-
lowing recital : " *Stephen Fitch*, of *Windsor*, in the county of
*Windsor*, and state of *Vermont*, having, by his petition, ad-
dressed to this court, stating, that he, on the 4th day of
*June*, in the year of our Lord, 1794, was lawfully married
to one *Charlotte Sellick*, then of *Stamford*, in the county of
*Fairfield*, and state of *Connecticut* ; and that the said *Char-
lotte*, among other causes and things, has been guilty of
wilful desertion for more than three years, with total ne-
glect of duty ; and, therefore, praying that a bill of divorce
may be granted him in the premises ; and it being shown to
the court, that the said *Charlotte* has been duly notified to
appear before this court, (if she see fit,) to show cause, if
any she have, wherefore the prayer of the said petition should
not be granted; and the said *Charlotte*, not appearing, or
showing sufficient cause, this court having fully heard said
petition, and the evidence in support of the same, do order,
and decree, that the prayer thereof be granted ;" and the
marriage is, accordingly, declared null and void, to all in-
tents and purposes.    It did not appear that the defend-
ant's wife had any actual notice of the pendency of these
proceedings ; and the act of the legislature of *Vermont* re-
lative to divorces, required only a publication in the news-
papers, of the citation, in the case of non-resident defendants.

In *October*, 1814, the defendant applied to the plaintiff, a
widow, residing at *New-Windsor*, in the county of *Orange*,
to receive his two sons into her family, as boarders.  To this
the plaintiff, after deliberation, consented, and the defend-
ant then requested permission for himself to remain in the
family a short time, until he could ascertain whether his
children would be contented with their situation.   This re-
quest was also acceded to, and the defendant, on coming
to reside in the family, affected a deportment of the ut-
most mildness, benevolence, and piety.  He frequently
dwelt, in conversation, with peculiar tenderness, on his de-
ceased friends, and in connection with them often spoke
of his wife, using such ambiguous phrases, as " the departure
of his wife,"—" that his wife had departed ;" so that,

ALBANY,
January, 1818.

BORDEN
v.
FITCH.

from the manner of his expressions and the occasions on which they were introduced, he fully impressed all who heard him with the idea that his wife was dead.   Soon after he was admitted into the plaintiff's family, he paid his addresses to her daughter, *Rebecca*, who was then of the age of twenty-five years, and materially assisted in the support of the family, by her needle-work.  The consent of the daughter, and her mother, the plaintiff, who were acting under the full belief that the defendant was unmarried, was obtained, and the marriage took place about the 28th of *November*, 1814.   On the very next day the defendant threw aside his assumed character, and commenced towards his new wife a conduct of extreme harshness and severity, though not amounting to personal violence, often raising gross and unfounded charges against her reputation and virtue, which were made the pretext for frequent threats and abuse, and finally, by his incessant persecution, her health and all her faculties were impaired.   About a week after the marriage, it was discovered that the first wife of the defendant was still living, and although this circumstance was an additional source of disquiet, yet there was at first no suspicion as to the legal validity of the subsequent marriage.   In the latter end of *January*, or the beginning of *February*, 1815, the defendant was required by the plaintiff to leave the house, and he removed, with the plaintiff's daughter, to lodgings which he had taken about three miles distant, where they continued a week, when application having been made to counsel, to take measures for the relief of the plaintiff's daughter, the defendant was arrested and imprisoned, on a charge of bigamy, by which means she was released, and returned to the plaintiff's family.   The defendant was stated to be a man of considerable property, and evidence was produced of the good character of the plaintiff's daughter, and of loss of service.

At the trial, *Rebecca Borden* was produced as a witness, on the part of the plaintiff, and was objected to, on the ground that the witness was the defendant's wife ; in support of which objection the decree of divorce of the supreme court of *Vermont* was given in evidence, and hence arose

ALBANY,
January, 1818.

BORDEN
v.
FITCH.

the question as to the validity of that divorce : the judge decided that it was void; and the witness being admitted, the defendant's counsel excepted to the opinion of the judge.

The judge charged the jury that the divorce granted in *Vermont* was of no validity, as regarded the plaintiff's right of action, and that the acquiescence of the plaintiff in the cohabitation of the defendant with her daughter, under the circumstances of the case, did not impair her right of action. The defendant's counsel excepted to this charge, and the jury found a verdict for the plaintiff for 5,000 dollars, being the amount of the damages laid in the declaration.

There was a motion in arrest of judgment ; and also to set aside the verdict.

*Bristed,* for the defendant. 1. As to the motion in arrest of judgment. Several and distinct rights of action are blended in the declaration. A plaintiff cannot join, in the same action, a demand in his own right, and a demand in the right of another. (*Hancock* v. *Haywood,* 3 *Term Rep.* 433. 1 *Chitty's Plead.* 200.) Here the plaintiff, in the third count, joins her own claim for the loss of the service of her daughter, with the claim of her daughter to be supported by her husband, the defendant. An action for a *tort,* must be brought in the name of the person whose *legal* right is invaded. (*Dawes* v. *Peck,* 8 *Term Rep.* 330. *Chitty's Plead.* 45, 46. 1 *Lev.* 247. 1 *Sid.* 375.) No action is sustainable against the defendant ; the second marriage being valid.

If the action is maintainable at all, it should have been brought by the daughter, not the mother. The daughter has an action, on the case, for the injury arising from the fraud practised upon her. (1 *Skinner,* 119. 1 *Bac. Ab. Action on the case.* (K.) Damages cannot be twice recovered for the same injury ; and a recovery by the mother will be no bar to the daughter's action.

The verdict, though general, cannot be amended. (*Hopkins* v. *Beedle,* 1 *Caines' Rep.* 347. 3 *Term Rep.* 433. *Brown* v. *Dixon,* 1 *Term Rep.* 276. *Union Turnpike Company* v. *Jenkins,* 1 *Caines' Rep.* 381. 391, 392, 394. *Stafford* v. *Green,* 1 *Johns. Rep.* 505.) The whole proof substantially

BORDEN
v.
FITCH.

applied to the third count. (*Vaughan* v. *Havens*, 8 *Johns. Rep.* 110 )

2. The evidence offered as to the cohabitation of the defendant with a former wife ought not to have been received. The first marriage in *Connecticut*, according to the laws of that state, ought to have been proved. In an action for seduction of this kind, the same proof of the first marriage is required as in an action for *crim. con.*, or on an indictment for *bigamy*. Though, in ordinary cases, marriage may be shown by reputation, cohabitation, or confession of parties, (*Fenton* v. *Reed*, 4 *Johns. Rep.* 52. *Telts* v. *Forster*, *Taylor's N. C. Rep.* 121. *Peake's Ev.* 263.) yet, in an action of *crim. con.* and for the same, or, perhaps, a stronger reason, in this action, it is necessary to show the validity of the first marriage; that it was duly solemnized according to the law of the state, or country, where it was celebrated. The *Connecticut* marriage act should have been produced, and, then, proof that the marriage was celebrated according to that act. (*Morris* v. *Miller*, 4 *Burr.* 2059. *East's P. C.* 470. 471.)

The plaintiff's daughter, in this case, was not a competent witness. It is admitted, in the declaration, that she was the wife of the defendant; and it is well settled, that a wife cannot be a witness for or against her husband, in a civil suit, except to prove the legitimacy or illegitimacy of her children. (*Rex* v. *Inhabitants of Bramly*, 6 *Term Rep.* 330. *Peake's Ev.* 182.) If it is said that the witness is not the lawful wife of the defendant, because he is married to another who is still living ; we answer, that the decree of divorce between the defendant and his first wife, by the supreme court of *Vermont*, is *conclusive* here.

Though judgments, on mere questions of property, are evidence only between the parties, yet proceedings *in rem*, or the sentences of ecclesiastial courts, in matrimonial causes, are evidence against third persons. (*Peake's L. of Ev.* 70—79. *Phillip's L. of Ev.* 223—234. *Gelston* v. *Hoyt*, 13 *Johns. Rep.* 150. *S. C. in Error*, *Id.* 561. *Dutchess of Kingston's case. Ambl.* 756. 11 *Stat. Trial*, 261.)

Again ; we contend, that under the constitution of the *United States*, (art. 4. sec. 1. art. 3. sec. 2. art. 6. 1 *U. S.*

*Laws*, 63. *Martin* v. *Hunter's Lessee*, 1 *Wheat*. 304. *Jackson* v. *Barnes*, 3 *Binney*, 75.) this decree of the supreme court of the state of *Vermont* is binding and conclusive on this, and all other courts of the *United States*. In *Stark* v. *Chesapeake Insurance Company*, (7 *Cranch*, 420.) The supreme court of the *United States* admitted a *record* of a court of common pleas, in *Maryland*, as to naturalization, to be conclusive; and in *Mills* v. *Duryee*, (7 *Cranch*, 481.) it was decided that *nil debet* was not a good plea, to an action founded on a judgment of a court of another state, and that *nul tiel record* was the only proper plea. *Story*, J. in delivering the opinion of the court in that case, says, that " the act (26th *May*, 1790, ch. 11.) declares, that the record, duly authenticated, shall have such faith and credit as it has in the state court from whence it is taken. If, in such court, it has the faith and credit of evidence of the highest nature, viz. *record evidence*, it must have the same faith and credit in every other court. Congress have, therefore, declared the *effect* of the record, by declaring what faith and credit shall be given to it. It remains only, then, to inquire, in every case, what is the effect of a judgment in the state where it is rendered ? " Were the construction contended for by the plaintiff to prevail, that judgments of the state courts ought to be considered *prima facie* evidence only, this clause in the constitution would be utterly unimportant and illusory. The common law would give such judgments precisely the same effect. It is manifest, however, that the constitution contemplated a power in Congress to give a conclusive effect to such judgments. And we can perceive no rational interpretation of the act of Congress, unless it declares a judgment conclusive, when a court of the particular state where it is rendered, would pronounce the same decision." If *nul tiel record* is the only proper plea in an action on a judgment of a court of record of another state, it follows, from the very nature and effect of that plea, that the judgment must be conclusive. (1 *Chitty's Pl.* 354. 480, 481. *Moses* v. *Macfarlane*, 2 *Burr*. 1009. 4 *East*, 311.)

The decision of the supreme court of the *United States*, on this long and much agitated question as to the validity or effect of the judgments of the courts of other states,

must put the matter forever at rest. It is a decision conclusive, and binding on all other courts in the *United States*, and is the law of the land. It may be useful, however, to examine the course of decisions on the point, in this and other state courts.

In *Hitchcock* v. *Aicken*, (1 *Caines' Rep.* 460.) which is the leading case in this state, the opinions and reasoning of *Thompson*, J. and *Livingston*, J. though differing with the majority of the court, accords with the judgment of the supreme court of the *United States*, in *Mills* v. *Duryee*, in giving full and conclusive effect to the judgments of the courts of sister states. In *Le Conte* v. *Pendleton*, (1 *Johns. Cas.* 104.) in 1799, to an action of debt on a judgment in *Georgia*, the defendant pleaded two pleas, *nul tiel record*, and *nil debet*, and the court directed the defendant to elect one of the two pleas, and strike out the other. The defendant, afterwards, elected the plea of *nil debet*, but the court did not decide on it. (*Cole. Cas.* 79.) In *Rush* v. *Cobbett*, (2 *Johns. Cas.* 256.) in 1801, the court declined deciding on the validity of the plea of *nil debet*. In 1803, in *Post* and *La Rue* v. *Neafie*, (1 *Caines*, 484.) the defendant pleaded *nul tiel record*, (S. C. note.) and the court decided the plea to be improper, and ordered a repleader ; and *Kent*, J. in *Hitchcock* v. *Aickin*, (1 *Caines*, 482.) considered that decision as leading to the conclusion, that if the judgment of another state was not to be treated in the pleadings as a *record*, it could not have the same obligatory force. Then, *e converso*, if it is to be treated as a *record*, it must have the same obligatory force ; and if the judgment of the supreme court of the *United States*, in *Mills* v. *Duryee*, is the law, the decree of the *Vermont* court, as to the *divorce*, must be conclusive on this court. The decision in *Hitchcock* v. *Aicken* was confirmed, it is true, by subsequent adjudications, but with some modification ; and the court have avoided deciding on the effect of a decree of a divorce in another state, where the parties were married there, or out of this state. (*Post* v. *Neafie*, 3 *Caines*, 22—33. per *Spencer*, J. *Jackson* v. *Jackson*, 1 *Johns. Rep.* 425. *Kilburn* v. *Woodworth*, 5 *Johns. Rep.* 37. *Hubbell* v. *Coudrey*, 5 *Johns. Rep.* 132. *Robinson* v. *Ward*, 8 *Johns. Rep.* 86. *Fenton* v. *Garlick*, 8

*Johns. Rep.* 194. *Taylor* v. *Bryden*, 8 *Johns. Rep.* 173.
*Pawling* v. *Bird's Executors.* 13 *Johns. Rep.* 192. *Walsh* v.
*Dunkin,* 12 *Johns. Rep.* 99.) In *Taylor* v. *Bryden,* the court
says, that when the party has once litigated his case before
a court of competent jurisdiction, and where no fraud or un-
fairness is pretended, every doubt and every presumption
arising on a matter in *pais* ought to be turned against him;
and that such judgment was not to be impeached but on po-
sitive proof of unfairness or irregularity.

The decisions in all the cases in this state, are on judgments
at common law, except that of *Post* v. *Neafie,* which was on
a decree of the court of chancery of *New-Jersey,* but by a
statute of that state, such a decree is made tantamount to a
common law judgment. Divorces belong to the cognizance of
*ecclesiastical* courts, in *England,* which are courts of exclu-
sive jurisdiction, and of the court of chancery here. But
in *England,* the ecclesiastical court pronounces only a di-
vorce *a mensa et thoro ;* divorces *a vinculo matrimonii* are by
act of parliament. The supreme court in *Vermont,* by
statute, had the sole and exclusive power and authority to
grant bills of divorce from the bonds of matrimony, for im-
potency, adultery, or wilful desertion for three years, and
also where either party shall have been absent seven years,
if unheard of during that time ; and also to grant bills of
divorce from bed and board, or from the bonds of matrimony,
for intolerable severity, as the court may judge proper, and
the nature of the case may require In *Gelston* v. *Hoyt,* (13
*Johns. Rep.* 141. 561.) the court held that such a decree of
a court of competent and exclusive jurisdiction was conclu-
sive, on the principle settled in the *Duchess of Kingston's
case.* (11 *St. Tr.* 260.)

As to the mode of proceeding to obtain these divorces,
prescribed by the statute in *Vermont,* it may be observed, that
our act, (1 *N. R. L.* 489. sess. 36. ch. 95. s. 9.) authorizes
the bill to be taken *pro confesso,* where the defendant is out of
the state, or cannot be found, or is concealed, after a publi-
cation of the order for appearance, for eight weeks ; and if
no appearance is entered after such publication, the court
pronounces its decree in the same manner as if the party

ALBANY,
January, 1818.

BORDEN
v.
FITCH.

had appeared.(a)    What should we say, if a court of *Ver-mont* should declare a second marriage void, though the party had been divorced *a vinculo*, by the court of chancery of this state, because such a decree had been given on taking a bill *pro confesso*, against a party out of the state?

But whatever may be the effect of the reasoning from the principles of the common law, the authority of the decision of the supreme court of the *United States* cannot be questioned, and must be conclusive.   Indeed, it was time that some decision of that court should be made, to settle the law on the subject; so that, in future, there might be a harmony and consistency in the decisions of the courts of the several states, on constitutional questions.   It would seem that the provision of the constitution of the *United States*, and the act of congress passed in pursuance of it, were intended, gradually, to produce uniformity in the laws and decisions of the several states, as best calculated to bind together, in permanent and prosperous union, the numerous members of our multiform body politic.   There are, then, three different doctrines or opinions floating in the state courts on this clause of the constitution of the *United States* :

1. That of this court, that judgments of *sister* states, like *foreign* judgments, are only *prima facie* evidence :

2. In *North Carolina, South Carolina,* and *Pennsylvania,* they are held as conclusive as in the state in which they were rendered : (*Camer. & Norw. Rep.* 486.   2 *Bay's Rep.* 485. 2 *Dallas,* 302.)

3. The supreme court of *Massachusetts* have taken a middle ground, between these opposite decisions of other states, and hold a judgment of a court of a sister state, not to be so high as a *domestic,* nor so low as a *foreign* judgment; but to be, as some learned philologists define a proposition, "neither significant nor insignificant, but between signification and no signification."   In *Bissel* v. *Briggs,* (9 *Mass. Rep.* 462.) PARSONS, Ch. J. who delivered the opinion of the court, said, that judgments of the courts of other of

(a) The court of chancery does not, of *course,* grant a decree of divorce *a vinculo matrimonii,* in all cases, though the adultery be admitted, or the bill be taken *pro confessa. Betts* v. *Betts, Williamson* v. *Williamson,* (1 *Johns. Ch. Rep.* 197. 488.)

the *United States*, were not to be considered as *foreign* judg-ments, the merits of which might be inquired into, as well as the jurisdiction of the courts rendering them; nor were they to be considered as *domestic* judgments, rendered in their own courts of record, because the *jurisdiction* of the courts rendering them was a subject of inquiry.   But that such judgments, so far as the court rendering them had ju-risdiction, were entitled to full faith and credit; and when declared upon as evidences of debts, or promises, the juris-diction of the courts rendering them might be inquired into, on the general issue, but not the merits of the judgments.

Again; the daughter ought not to have been admitted to give evidence of a promise of marriage; because, in an ac-tion for seduction, she cannot be a witness to prove such a promise in aggravation of damages, since she herself has a right of action for a breach of promise; (*Foster* v. *Scofield,* 1 *Johns. Rep.* 297.) nor of the marriage itself, because she has her action also for the injury. (*Skinner's Rep.* 119.)

Nor can she give evidence of bad treatment by the de-fendant, if considered as his *wife,* nor if considered as a *feme sole,* for the *gist* of this action is the mother's loss of service, not the daughter's ill treatment.

Another objection is, that the resolution of the general as-sembly of *Connecticut* was tantamount to a divorce *a mensa et thoro,* which would protect the defendant from an indictment for *bigamy,* and, consequently, must be a bar to a suit for se-duction, but would not prevent him from applying for a divorce *a vinculo matrimonii.* (*Pawling* v. *Bird's Executors,* 13 *Johns. Rep.* 208.)   That the *domicil* of the wife is that of her hus-band, is a sufficient answer to her not being in *Vermont* at the time of the sentence there. (*Jackson* v. *Jackson,* 1 *Johns. Rep.* 432.   13 *Johns. Rep.* 208.)

It may be remarked that in all the cases decided by this court, where this question has arisen, the plaintiffs have been citizens of this state, claiming to enforce the judgment of another state here.   In the present case, the defendant claims protection here for rights granted to him by the highest competent legislative and judicial authority of ano-ther state.

*P. W. Radcliff,* and *T. A. Emmet,* contra.  1. As to the causes in arrest of judgment.  It is true the daughter may maintain her action for a *tort,* and may not the mother also? In case of a battery of the wife, the husband and wife may bring a joint action, and the husband may also bring, in his own name, an action of trespass, *per quod consortium amisit.*  So, also, in the case of master and servant.  A wrong may produce injury to two persons, each of whom may have his action. Matter, not actionable, may be stated in the declaration by way of *inducement ;* and it is no ground for arresting the judgment.  The court will intend that the damages were given for the actionable part only. (*Steele* v. *West. Inl. Lock Navig. Co.* 2 *Johns. Rep.* 283.  *Phettiplace* v. *Steere, Id.* 442. 2 *Johns. Cas.* 22. n. (*a*).)  There is but one injury sued for by the plaintiff; the rest of the matter stated is mere historical narration, or by way of inducement.  The objection amounts to this, that matter of inducement is stated, which would be a cause of action to another person.  The defect is *amendable.* (*Stafford* v. *Green,* 5 *Johns. Rep.* 505.) The evidence given applies to the first and second counts, and judgment may be entered on them, though the third count is bad.

2. As to the bill of exceptions.  The defendant must be confined to the points on which the judge's opinion was given, and to which the exceptions at the trial were taken.  (*Graham* v. *Carman,* 2 *Caines' Rep.* 168, 169.  *Frier* v. *Jackson,* 8 *Johns Rep.* 507.)

In all cases, except *bigamy* and *crim. con.* proof of cohabitation, connected with other evidence of a similar kind, is sufficient to prove a marriage. (*Morris* v. *Miller,* 4 *Burr.* 2057.  9 *Mass. Rep.* 414. 492.)  Proof of the actual marriage is not necessary, except in those two cases. (*Phillip's Ev.* 307.)  The proof here was, however, admissible as preliminary to the evidence of the act of the legislature of *Connecticut,* decreeing a separation ; and being part of the matrimonial history of the defendant, for a period of 23 years. But the real and great question in this case, on which the competency of the daughter as a witness depends, is, whether the decree of divorce by the court of *Vermont,* is con-

clusive here? That decree proceeds on the ground of the *wilful desertion* of the wife for three years; she residing during all that time in the state of *Connecticut*, never having been, at any time, within the jurisdiction of *Vermont*, and living under the protection of the act of the legislature of *Connecticut*, decreeing her separation from her husband, and allowing her *alimony*, during the time she should choose to live so separate.

The *Vermont* decree would not be valid and conclusive here, if it were merely a judgment for the payment of money. From 1803 to the present time, the law of this state has been, "that a judgment in a sister state is only *prima facie* evidence of a debt," and is not conclusive here. (*Hitchcock* v. *Aickins*, 1 *Caines*, 460.) In *Jackson* v. *Jackson*, (1 *Johns. Rep.* 426. 432.) *Spencer*, J. in delivering the opinion of the court, says, "The case of *Hitchcock & Fitch* v. *Aicken* must, as respects this court, be an authority for saying, that a judgment obtained in a sister state is liable to be impeached in a suit brought on it here, notwithstanding there may have been a full and fair trial in the original suit." In 1809, 1810, and again in 1816, the doctrine is asserted and repeated, that "It is well settled, that a judgment in another state is to be considered here as a *foreign* judgment, in every respect, except in the mode of proving it, which is regulated by a law of the *United States*. It is only *prima facie* evidence of a debt," &c. (*Hubbell* v. *Cowdry*, 5 *Johns. Rep.* 132. *Taylor* v. *Bryden*, 8 *Johns. Rep.* 173. *Paulding* v. *Bird's* Executors, 13 *Johns. Rep.* 205.) In all these cases, the defendant *appeared* in the original suit and vindicated his right. In no case is it even *doubted*, for a moment, that if the defendant did not appear, or had no opportunity to defend himself, the judgment would not be conclusive. The last decision was made three years after that of the supreme court of the *United States*, in *Mills* v. *Duryee*. In *Kilburn* v. *Woodworth*, (5 *Johns. Rep.* 41.) which was a suit commenced in *Massachusetts*, by an attachment of goods, without any personal notice, the court say, that the judgment is not even, *prima facie*, evidence, sufficient to support an *assumpsit*; and that to bind a defendant personally