Bockee, Senator.
The title of the plaintiff in error, who was the defendant below, depends upon the decision of the question whether the deed executed by John Yan Winkle and Jane Yan Winkle his wife, to Jacob Van Winkle, bearing date the 5th of May, 1760, was a valid and effectual conveyance of the fee simple estate which Jane Yan Winkle held in the premises. The chief justice of the superior court charged the jury that Jacob Van Winkle did not take a fee simple estate in the premises by virtue of the conveyance aforesaid, but only an estate for the life of John Yan Winkle as tenant by the curtesy ; and the supreme court have affirmed the decision of the superior court. I feel the hardship of opposing the concurrent authority of the eminent jurists who preside in these respective courts, but here in this court I must not sacrifice my own judgment to their authority. Chief Justice Nelson, in delivering the opinion of the supreme court, remarks, that at an early period of our colonial history, a usage seems to have grown up, independent of any statute, under which a feme covert was allowed to convey her real estate, by uniting with her husband in a deed, and acknowledging the same, without resorting to the common law mode of fine and recovery; and that this is manifest both from legislative acts and judicial decisions. He proceeds to say, that an acknowledgment on the part of the feme, in some form, and before some competent officer, has always been deemed essential. Here I must differ from the learned chief justice. I do not find any evidence in this voluminous case, in the thousand and one authorities cited by the counsel, in the records of colonial legislation, or in the history of the times, that acknowledgment before a competent officer was always deemed essential to give effect to the deed of a feme covert.
*181 In the year 1664, the English government, practising upon the Rob Roy principle, which it has not yet forgotten, “that he shall take who has the power, and he shall keep who can,” took forcible possession of the then Dutch colonies of New Amsterdam and Fort Orange. The first colonial assembly held under the proprietary government of the Duke of York, October 30th, 1683, passed the act entitled “ The Charter of Liberties,” in which it is declared that no estate of a feme covert shall be sold or conveyed but by deed acknowledged by her in some court of record, the woman being secretly examined if she doth it freely without threats or compulsion of her husband. On the 2d of November, 1683, the same assembly passed another act providing that no conveyance of land shall be of any force, unless proved or acknowledged before one of his majesty’s justices of the peace, and recorded in the county where the land is, within six months after the date of the deed. Another act, “ to prevent deceit and forgery,” passed October 22d, 1684, required the acknowledgment to be made by the grantor before one of the judges of the court of oyer and terminer. These several acts, and the whole body of laws Imown as the “ Duke’s laws,” were abrogated and made Void by the first colonial assembly held after the revolution of 1688, and then ceased to have any force or effect in the colony. This same colonial assembly, on the 6th of May, 1691, passed an act declaring “the rights and privileges of their majesties’ subjects within their province of New-Y:ork,” which contains the provision that no estate of a feme covert Shall be sold or conveyed but by deed acknowledged by her in some court of record, the woman being secretly examined if she doth it freely without threats or compulsion of her husband. This last mentioned act appears to have been repealed by the king in 1697> and from this period till the year 1771, we have no legislative enactment whatever requiring the acknowledgment, the proof or recording of deeds or conveyances executed by femes covert, as a condition precedent to their validity. It cannot be denied that femes covert did convey their estates by deed, and in the absence of all legal regulation respecting acknowledment, we may rationally infer that the conveyance was deemed *182 valid without it. The act of the 30th of .October, 1710, merely provides against the accident of lost deeds, by making the record of deeds which have been duly acknowledged and recorded, or the.transcript thereof, evidence in any court of record. This • act does not touch the question as to the validity of the execution of deeds, either of femes covert or others, and gives no direction as to the proper officer before whom acknowledgments are to be made. Hence arose the practice of acknowledging, proving and recording deeds, as recited in the preamble of the act of 1771. The ancient records, therefore, may shew the practice and usage of the acknowledgment of deeds by femes covert; but they will not shew another practice and usage which may well be supposed to have existed in the then loose and unsettled state of the law and the irregular manner of doing business, of omitting such acknowledgment altogether; especially as there was no law in force requiring acknowledgment to be made, and the acknowledgment, proof and recording, were mere matters of evidence, and were regarded as nothing more than a security agamst the accidental destruction and loss of deeds or writings. There may indeed be no reported case where the deed of a feme covert has been held to operate without a certificate of acknowledgment; nor am I aware of any where the deed of a feme covert] given- previous to 1771, has been held invalid for the want of such certificate. The argument founded on the absence of authority, is as strong on one side of the question as the other. We cannot ascertain how many estates were held under the unacknowledged deeds of femes covert. There were no Cowens, Wendells and Hills, in those days, to report the decisions of colonial judges, and transmit to us the concentrated wisdom of the sages of the law. We shall not derive much benefit, therefore, nor any clear or certain light, from an enquiry into the usage and practice in the colony of acknowledging or proving deeds prior to 1771. The most we can learn is, that a very uncertain, desultory and unsettled practice prevailed. Nor shall we find any thing clear or definite on this subject till we come to the act of the colonial assembly of 1771. This act was the subject of very elaborate discussion in the case of Jackson v. Gilchrist, (15 *183 Johns. Rep. 89,) and received all the elucidation which such minds as those of Henry, Van Yechten, Yan Burén and Chief Justice Thompson, could give to it. In that case, Ann Bridges, of Elizabethtown, New-Jersey, being seized in fee in 1711, joined with her husband in a conveyance of the premises. A certificate of one of the justices of the peace for the county of Essex, in New-Jersey, appeared upon the deed, stating “ that the said parties came before him to acknowledge the within indenture to be their act and deed.” The court held that this case was within the spirit, intent and meaning of the act of 1771; that the deed was valid and effectual to pass the estate of the feme covert; and they rendered judgment against the plaintiffs, who were her heirs at law. The case before us differs from that of Jackson v. Gilchrist only in this, that John and Jane Yan Winkle did not go before a justice of the peace in New-Jersey to acknowledge the execution of the deed. If there is any difference in principle between the two cases, it is altogether beyond my comprehension. The principles settled and established by the unanimous decision of the court in Jackson v. Gilchrist, after the most elaborate argument by the ablest counsel then at the bar, and before judges not inferior to any who preceded or have followed them, ought, in my opinion to have a decisive and controlling influence in the decision of the present case. Let us look at some of the positions taken by Chief Justice Thompson, who delivered the opinion of the court in Jackson v. Gilchrist. He says, it was the usage in this and other British American colonies for femes covert to convey their estates by deed, and that the common law mode of conveyance by fine was not practised here; that the charter of the Duke of York which provides that the woman be secretly examined, was not in force; and that in 1711, when Ann Bridges joined with her husband in the conveyance, and when the acknowledgment in question was taken, there was no charter or statute regulation on the subject in force here, but that a loose, unsettled practice prevailed, as is set forth in the recital to the act of 1771. So it was in 1760, when John and Jane Yan Winkle conveyed the premises in controversy in this suit, to Jacob Yan Winkle, *184 from whom the plaintiff in error derives his title. There was one objection taken in Jackson v. Gilchrist against the validity and operation of the act of 1771, which cannot apply in the present case ; to wit, that the act ought to be considered null and void on account of its interference with the vested rights of the heirs of Arm Bridges. In this case, Jane Van Winkle having lived till the year 1796, there were no vested rights in the Tan Winkles to be divested by the operation of the act. In answering the objection of counsel that the act of 1771 was itself null and void, on account of its interference with vested rights, Chief Justice Thompson observes, that the case was not one of those extreme and palpable ones in which the court would be justified in setting aside the act altogether. “ It is an act,” he added, “ confirming and quieting the title of bona fide purchasers, and sanctioning an ancient custom as to the form of acknowledgment. Such an act ought to receive a liberal and benign interpretation, for the purpose of securing titles derived under such deeds.” If the court could resort to such a construction for the purpose of giving efficacy to the act against heirs clothed with vested rights, they might well concede the benefit of this benign and liberal interpretation to the present plaintiff in error, whose title, if confirmed by the act of 1771, would interfere with no vested rights. It is a principle in the construction of statutes, insisted upon by Chief Justice Thompson in Jackson v. Gilchrist, and recognized by all elementary writers, that though the preamble cannot control the enacting clause when it is clear and unambiguous, yet where any doubt or ambiguity exists, the preamble must be resorted to for the purpose of explaining the intention of the makers and the mischiefs which the statute was designed to remedy. Chief Justice Thompson, in considering the question whether the defendant by actual possession was brought within the purview of the enacting clause of the statute, very properly, I should think, considers the enacting clause with an eye to the preamble, takes them both together for the purpose of explaining what is meant by the legislatüre, and spreads the mantle quite wide enough to cover the deeds both of Ann Bridges and Jane Tan Winkle. The preamble is as follows: *185 “ Whereas it has been an ancient practice in this colony to record deeds concerning real estates, upon the previous acknowledgment of the grantors, or proof made by one of the subscribing witnesses of the execution of the instruments before a member of his majesty’s council, a judge of the supreme or county court, or a master in chancery, and sometimes before a justice of the peace: And whereas, there are lands and tenements held under the deeds of femes covert, not acknowledged ip. manner-aforesaid, and yet made bona fide, and for valuable considerations ; the purchasers whereof, and those holding under them ought to be secured both in law and equity, against the respective grantors, their heirs and assigns” &c. Here we have a perfectly true and graphic description of the very case of Jacob Van Winkle, who held under a deed from a feme covert, not acknowledged or proved before the proper officer, and yet made bona fide, for a valuable consideration; and he “ ought to be secured both in law and equity.” If language has any meaning, the legislature surely contemplated this very case, where lands were bona fide held, under the unacknowledged deed of a feme covert. Can we with any propriety charge upon the colonial assembly of 1771 the monstrous fatuity of so clearly pointing out the mischiefs intended to be remedied, and yet omitting to apply the remedy ? The words of the enacting clause are broad enough to cover the case; and following the example of Chief Justice Thompson by taking the preamble as explanatory of the enacting clause and construing both together, I think we cannot err in the conclusion that the legislature intended to provide, and have provided, for a confirmation of the deeds of femes covert, not only where the private examination was omitted, but where the acknowledgment or proof by a witness before the officer was also omitted. We are to give to statutes the same reasonable construction which is given to other instruments and writings; and we are authorised by precedent to give to this particular statute a benign and liberal interpretation, for the purpose of quieting titles and securing bona fide purchasers. In the certificate of the justice of the peace endorsed pn the deed of Ann Bridges, it was not stated in terms that the *186 parties made any acknowledgment; but merely that they came before the justice to acknowledge &c. Yet Chief Justice Thompson had no difficulty or hesitation in considering this as an acknowledgment. Applying the same rule of liberal construction to the statute in question, are we not fully authorized to say, that the colonial assembly did what it was their professed and declared intention to do, viz. confirm the deeds offemes covert, though not acknowledged, provided they were given bona fide, and for a valuable consideration, and possession was then held under them ? I have before said, it was not in my power to distinguish this case in principle from that of Jackson v. Gilchrist. If old John De Gray, whose signature was proved as a witness to the deed of Jane and John Van Winkle, had been a justice of the peace of the county of Bergen, in New-Jersey, and had certified that the parties acknowledged the execution of the deed before him, I do not think the case would have been in any degree strengthened. He would not have been one of those officers who, by any law or usage of the colony of New-York, had a right to take the acknowledgment of deeds. No ancient usage has been adverted to showing that justices of the peace in the colony of New-Jersey were proper officers before whom the proof or acknowledgment of conveyances of lands within the colony of New-York was to be made. It is true that, in Jackson v. Gilchrist, the court did not consider the effect of a deed unacknowledged by the feme covert. That case was not before them. They laid some stress upon the half-way acknowledgment before the New-Jersey justice, and the opinion speaks of a presumption raised by the acknowledgment in favor of the secret examination of the woman. But this was unnecessary, The court pointedly placed their decision upon the force and effect of the act of 1771. This act will be equally operative with or without the presumption of a secret examination. The principles which the court established, and the efficiency and healing influence which they gave to the act above mentioned, are as available to the tenant in this ejectment, as to the tenants in the great Kayaderosseras case. According to my views pf the law of this case, if the execution of the deed of John, and *187 Jane Van Winkle, to Jacob Van Winkle, was originally defective, the defect was healed by the act of 1771, and the deed made effectual to convey the estate which Jane Van Winkle held in the premises.
As to the construction of the deed, I do not believe it is to be considered merely as a conveyance of the life estate of John Van Winkle. There would have been no necessity for making Jane Van Winlde a party to süch a conveyance. It purports to convey all the estate of John Van Winkle, and Jane his wife, “ with the voluntary consent and good liking of the said Jane,” testified by her being made a party thereunto, and signing and sealing the same. The deed, though inartificial, contains sufficient granting words to convey the fee simple of the estate; and at this late period it ought not to be set aside for mere informality.
In my judgment the claim of the plaintiff below, now the defendant in error, has no merits. It is a claim raked from the dust and ashes of antiquity, conflicting, with a fair and bona jide purchase of the estate, after it has been held and transmitted as an estate of inheritance for more than three quarters of a century.
I think the judgment of the supreme court is erroneous and should be reversed.
Porter, Senator.
There is no room to doubt that the legal title to the lot in question was shown to have been in Jane Van Winkle, the wife of John Van Winkle, on and before the 5th day of May, 1760. Upon that day John Van Winkle executed a conveyance of the lot to Jacob Van Winkle; and the great question in the case is, whether this deed was so executed by Jane, the wife, as to convey her estate in the lot. The plaintiff in error insists that Jacob acquired a fee by that deed; while the defendant contends that it only conveyed the life estate of John Van Winkle, who held as tenant by the curtesy. The deed was never acknowledged by either the husband or wife; and unless the execution by the wife is to be treated in the same man *188 ner as if she had been a feme sole, then the deed cannot stand as her conveyance. The case therefore involves an inquiry into the law which prevailed in the colony of New-York, at the period when the conveyance in question was executed, in respect to the execution of deeds made by married women.
The English common law on this subject was never adopted by the colbny. This appears as well from the legislation of the colony, as from the ancient practice. By an act of the colonial assembly passed May 6th, 1691, (3 R. 8. App. 3, ls¿ ed.) it was provided, “ That no estate of a feme covert shall be sold or conveyed, but by deed acknowledged by her in some court of record, the woman being secretly examined if she doth it freely, Without threats or compulsion of her husband.” This shows that a different practice existed before that time, which the legislature thought should be limited, for the protection of married women; and if the law had been suffered to remain, the present question at least could never have been made. But the law was repealed in 1697; and ho trace of any legislation on the subject can be found from that time down to the act of 1771. That there must have been a common practice, however, recognized by the courts of the tune, and which, when ascertained, should have the force of law, nó one, 1 think, can deny. A statute was passed on the 30th of October, 1710, which provided that all deeds, duly acknowledged and recorded, should be received in evidence; (3 R. 8. App. 5, §4;) but it prescribed no rule in respect to deeds executed by married women. In Jackson v. Schoonmaker, (2 Johns. Rep. 234,) Keht, Ch. J. said that, until 1771, the mode of taking the proof of deeds was rather loose and unsettled, and that the practice in the colony before that time was undoubtedly to be regarded on a question touching the validity of an ancient deed. And we know from many deeds of dates long prior to 1771, which have been brought under judicial cognizance, that, in general, there existed no difference in practice between acknowledgments by married women, and those made by other grantors. The cases quoted by Thompson, Ch. J., in Jackson v. Gilchrist, (15 Johns. Rep. 109,110,) *189 show how far the usage in the different colonies has been recognized as having the force and effect of law.
• These views are also confirmed by the act of February 16, 1771, the preamble of which is as follows: “Whereas it has been an ancient practice in the colony to record deeds concerning real estates, upon the previous acknowledgment of the grantors, or proof made by one of the subscribing witnesses, of the execution of the instruments before &c.: and whereas there are lands and tenements held under the deeds of femes covert, not acknowledged in manner aforesaid, and yet made bona fide, and for valuable considerations; the purchasers whereof, and those holding under them, ought to be secured, both in law and equity, against the respective grantors, their heirs and assigns.” The statute then enacts, “ that no claim to any real estate, whereof any person is now actually possessed, &c., shall be deemed to be void upon the pretence, that the feme covert granting the same, had not been privately examined,” &c. This most assuredly recognizes an ancient practice, not only to take acknowledgments of deeds executed by married women as though they were single, but also to prove such execution by a subscribing witness; thus showing that no distinction was made between them and other grantors. Deeds thus proved and recorded, and the records thereof, were made evidence by the act of 1710. But the preamble to the act of 1771 goes further, and shows, as I think, that the very case before the court was contemplated by the legislature. It speaks of lands &c. held under deeds of married women, “ not acknowledged in manner aforesaid,” which, it says, ought to be confirmed; and then declares that no such” deed shall be void upon the pretence that the wife had not been privately examined. The meaning I understand to be this: It shall not be a good objection to the validity of a deed executed by a feme covert, that she has not acknowledged it, whereby there could be an opportunity given to take her private examination. The acknowledgment referred to in the preamble by the words “ in manner aforesaid,” was before some public officer, and had no reference to a private examination. If, therefore, the legislature *190 meant to declare that the deed of a feme covert, in cases where the lands were held under it, ought to be deemed valid, though not acknowledged, where is there any room left for argument to show that the deed in question is one which ought to be deemed void? It was executed by a feme covert, upon good consideration, but was not acknowledged before any magistrate or officer; and the land was in the possession of the grantee when the act was passed.
In the case of Jackson v. Gilchrist, (15 Johns. Rep. 111) Ch. J. Thompson, speaking of the above act and its preamble, put a construction upon them, which, if correct, will certainly deprive the plaintiff in error of any aid to be derived therefrom. He there said:' “ It is not necessarily to be inferred from this provision, that it applied to cases where no private examination had, in fact, been made. The act was intended to confirm ancient conveyances, and to prevent the want of evidence of a private examination being set up to avoid the deed, presuming the evidence of the fact to be lost by the lapse of time. Had it been intended to make good a deed where no private examination at all had taken place, it would, probably, have been so declared in terms, and not have spoken of this defect as a fretence J The counsel for the defendant in error quoted and relied upon this part of the opinion, in support of his construction of the act of 1771. It must be remembered, however, that the case then before the court was one in which the deed was acknowledged by the feme covert, but the certificate did not state that there had been a private examination. To sustain the deed, it did not become necessary to consider the preamble and act in reference to the question now under discussion. If the preamble and the enacting clause are to be taken together, in order to arrive at the just meaning and force of the act of 1771—the one pointing out the evils to be remedied, and the other applying the remedy to those evils—then we have here the declaration, “ that certain lands were held under deeds of femes covert, not acknowledged &c., the purchasers whereof ought to be seemed, both in law and equity, against the respective grant *191 ors, their heirs and assignsand immediately afterwards it is enacted, “ that no claim to any real estate &c. shall be deemed to be void, upon the pretence that the feme covert granting the same, had not been privately examined.” The learned chief justice who delivered the opinion in Jackson v. Gilchrist, was not warranted, I think, in the intimation there thrown out, that the act was inapplicable to deeds “where no private examination had in fact been madefor the very evil to be provided for was, that the deeds had not been acknowledged at all. His exposition of the meaning of the act is founded on the use of the words “upon the pretencebut the preamble and the first section repel any such meaning. The words “upon the pretence,” have, in my opinion, the same meaning in that connection, as the words “ for the reason;” and by substituting the latter, the act will read thus: “ That no-claim to any real estate &c. shall be deemed to be void, for the reason that the feme covert granting the same, had not been privately examined.” This interpretation makes the first section of the act harmonize with the preamble, and effects what the preamble says ought “ both in law and equity” to be done.
According to my view of the act of February 16th, 1771, the deed of a married woman, executed before that time, may be proved in the same maimer as the deed of a feme sole. I am unable to distinguish between the proper legal effect to be given to a simple acknowledgment "of a deed by a married woman, and the proof of such a deed by a subscribing witness. Nor am I aware of any law or usage, prior to the act of 1771. which required a feme covert to acknowledge the execution of a deed before an officer, in order to give it effect as her deed. I am therefore of opinion that the deed in question was properly proved to be the conveyance of Jane Van Winkle.
The next question that naturally arises is, did Jane Van Winlde grant and convey her estate in the premises by this deed? It must be conceded that it is a very informal conveyance, so far as relates to her interest in the premises ; but if her intention to convey that interest appears from the deed, with reasonable certainty, it must be allowed to operate accordingly. *192 Blackstone, in laying down rules for the construction and exposition of deeds, says, one rule is that “ the construction favorable, and as near the minds and apparent intent of the parties, as the rules of law will admit.” (2 Bl. Comm. 379.) Another rule is “ that the construction be made upon the entire deed,” and “ that the deed be taken most strongly against him that is the agent or contractor, and in favor of the other party.” Lord Mansfield, in Goodtitle v. Bailey, (Cowp. 600,) says, “The rules laid down in respect to the construction of deeds, are founded in law, reason and common sense: That they shall operate according to the intention of parties, if by law they may.” And the rule is believed to be undisputed, that courts will uphold a deed, if they can discover the intent, and no principle of law is violated. But that intent must be seen from the examination of the deed itself, and .not from proof aliunde. Now the deed in question states that Jane united in the execution of it with her husband, voluntarily and of her own “ good liking;” that John Yan Winkle granted the premises, and also all the estate of himself and Jane his wife, to the grantee in fee; and then a clause is added whereby. John and Jane his wife grant that Jacob, the grantee, shall have, hold and enjoy the premises forever. But it is objected by the counsel for the defendant in error, not that the deed fails in apt words to create a grant, but that it is not the grant of Jane Yan Winkle: that the words are not hers, but those of her husband. It is true that in one part of the deed, the language importing a grant proceeds from the husband alone; but when the deed goes on to grant all the right and title of both husband and wife, and then both unite in saying that the grantee shall enjoy the same peaceably forever, I cannot bring myself to doubt that there is language used in it which expresses an intention on the part of Jane to convey all her title. Of the very numerous cases cited by counsel to support this. view, I will only refer to Jackson v. Blodget, (16 Johns. Rep. 172,) and Jackson v. Fish, (10 id. 456.) I am therefore of opinion, not only that this deed of the 5th May, 1760, was duly executed by Jane Yan Winkle to pass her title to the premises, but that all her estate was thereby conveyed to Jacob Yan Winkle.
*193 There is still another question which it may be necessary to decide, should it so happen that a majority of the court differ from me in the conclusions at which I have arrived upon the points discussed ; and that is the question of adverse possession. It is a well established rule, that a grant in fee by a husband and wife, when the title to the land is in the wife, and she does not acknowledge the deed, so that it becomes inoperative in relation to her title, passes nothing but the husband’s interest, which may be but a life estate; and after his death the title reverts to the wife, or, in case of her death, to her heirs. If in this case the deed in question operated to convey only the life estate of John Van Winkle, Jacob must be deemed in law, whatever he may have considered in respect to his title, to have held the same estate. And all those claiming through Jacob, during the life of John Van Winkle, must be regarded as having come in under the same title. After the death of Jane, in 1796, the reversion in fee vested in her heirs, but still subject to the life estate outstanding in the grantee of her husband. While this life estate continued, the right of entry which had vested in the heirs of Jane, was suspended; and during that time no adverse possession could commence running. But the life estate terminated in January, 1816, and then the right of the heirs of Jane to enter, became perfect. The statute to prevent the operation of the common law rule that the alienation by a husband worked a discontinuance of the wife’s estate, declares that, after his death, the wife and her heirs may enter and hold the same according to their title. (1 R. L. 181, 2.) The question then presents itself, whether the possession of Jacob Van Winkle, John Van Blarcum and James Graham, under their respective deeds in fee, claiming, as the proof fully establishes, the absolute right to the premises, in hostility to all the world, though they were estopped from asserting that right during the life time of the tenant for life, became adverse to the title of the heirs of Jane Van Winkle, on the termination of the life estate? It is contended by the counsel for the defendant in error, that Graham, who was in possession when that event happened, became a tenant at sufferance; and that this tenancy would continue *194 until some act was done rendering him a tort-feasor. The superior court treated this possession as adverse, but denied that it prevented the deed to Simeon Van Winkle, of December 19th, 1816, from passing one fourth of the title, giving as a reason that it was a conveyance by one tenant in common to another ; and the supreme court came to the same conclusion, but upon the ground that Graham was a mere tenant at sufferance, and that his possession, therefore, was not adverse.(a) The case relied upon to show that Graham’s continued possession was not adverse to the title of the heirs of Jane Van Winkle, is Jackson v. Cairns, (20 Johns. Rep. 301.) That case lays down the doctrine that a husband, seized of lands in right of his wife, who continues in possession after her death, claiming, the absolute title and making improvements, and who gives a mortgage upon the premises, is still a tenant at sufferance ; and his continuance in possession is not adverse or hostile to the true owners. The case is certainly a strong one in-some respects, but yet I cannot consider it as íurnishing a rule which should govern the case before the court. If John Van Winkle, the husband of Jane, had never conveyed this lot, but had retained the possession until after his wife’s death, and then had built upon and mortgaged it, claiming it as his OAvn, the cases would have been parallel; and the principle of the one cited might have been urged in this with ir *195 resistible force. But here we have a purchase in fee by Jacob Van Winkle, hi form at least; and that is a circumstance to show the intent with which this claim and possession commenced. Then we have subsequent conveyances in fee, and all the usual evidences that the grantees claimed the absolute title for the period of fifty-six years before the life estate terminated; which I think presents a different case from that of Jackson v. Cairns. Upon the principle claimed as applicable to the present case, if Graham had lived fifty years after the termination of the life estate, and had not deeded this lot, though he continued to claim the ownership of it, as he and his grantors had done for fifty-six years before, and then left it to his heirs at law, without devising it, the adverse possession would not have commenced; nor would it ever commence, until some future claimant under the title attempted to convey it in fee. A rule which may be followed by such consequences, cannot be sustained. It contravenes the spirit and policy of the limitation which the law imposes upon claims to real estate, and unsettles titles which time has established. Here has been a claim of title by the. persons in possession, under deeds in fee, for a long period, in open hostility to the right of Jane and her heirs; and although the law wisely forbade the assertion of this adverse title, for any purpose, during the pendency of the life estate, yet it appears to me contrary to sound principle and common sense to say that the person who was in possession at the termination of the life estate did not hold adversely afterwards. There was nothing to prevent the heirs from asserting their title then; and if they omitted to do so, they were working a wrong; for they were continuing the deception under which the occupant labored, possibly to his great and irreparable damage.
In consonance with the view I have taken of this question, we have a statute which declares that every husband or other person, having an estate determinable upon any life or lives, who, after the determination of such estate, without the express consent of the party immediately entitled, shall hold over and continue in possession, shall be adjudged a trespasser. (1 R. *196 L. 107, § 7; 1 R. S. 749, § 7.) To decide that he was not holding adversely, and yet adjudge him to be a trespasser, would present an apparent contradiction. A tenant at sufferance cannot be a trespasser in the nature of things. The two characters are inconsistent.
I am therefore of opinion that, on the death of John Van Winkle, the tenant for life, the adverse possession of Graham commenced. And it follows, that the deed from Jane to Simeon Van Winkle, of December 19th, 1816, having been executed after the adverse possession commenced, was void; unless, as has been contended, it is saved on the ground that one tenant in common may convey lands held adversely to his co-tenant. I find no direct authority for this exception, and certainly the language of the statute will not warrant it. The statute declares that “ no person shall buy or sell &c., unless the grantor shall have been in possession &c., for the space of one year.” The language of the authorities is equally general. In 2 Hill. Ab. p. 318, § 91, it is said, “ A mere right of entry is not assignable; as for instance the right of one disseised.” Again, in the same book, at p. 411, § 28, it is laid down as a general rule of law, “ that a deed is void if made by one who, though having a legal right to land, is at the time of conveyance disseised. The law will not permit any person to sell a quarrel, or as it is commonly termed, a pretended title.”
The deed to Simeon Van Winkle, of December 19th, 1816, upon which the claim of the defendant in error to one-fourth of the premises in question depends, was in my opinion void hy reason of adverse possession. The defendant in error has been allowed by the judgment of the court below to recover under that deed; and should this court not agree with me upon the other points discussed, I am still in favor of reversal on this last ground.
Sherwood, Senator.
On the fifth day of May, 1760, John and Jane Van Winkle executed an instrument purporting to be a deed of the premises in question, to Jacob Van Winkle. This deed was produced and read in evidence on the trial by the *197 counsel for the plaintiff below, to estop the defendant from setting up an adverse title and possession, and to confine him to a title derived from Jane Van Winkle, through whom the plaintiff below also claimed. The defendant had a right to avail himself of the deed, though introduced by his adversary, and the whole case turns, therefore, upon its validity and effect.
The first objection taken to the deed is, that it was not acknowledged by the wife, before a public officer, and therefore did not pass her estate.
It is conceded that, under the colonial government, a feme covert might convey her real estate by deed, executed in conjunction with her husband, without resorting to the common Jaw mode of conveyance by fine. (2 Kent’s Comm. 151; 15 Johns. Rep. 115.) But it is insisted that her acknowledgment before some competent officer was at all times deemed necessary to give effect to her deed, by doing away the presumption of law that she was acting under the coercion of her husband. How far this practice of acknowledgment extended, in the more early settlement of the colony, I have been unable to determine; for I cannot find, from the examination of any authorities or writings upon the subject, that any particular practice of the kind prevailed prior to the “ Charter of Liberties,” commonly called the “ Duke’s Charter,” granted in 1683. It is evident, however, that at that time some act was deemed necessary to protect the wife against the exercise of an arbitrary control over her property by the husband; and it was declared by that charter, among other things, “ That no estate of a feme covert shall he sold or conveyed but by deed acknowledged by her in some court of record, the woman being secretly examined, if she doth it freely without threats or compulsion of her husband.” (2 R. L. App. 5.) This provision of the charter was evidently intended to prescribe the manner in which the estates of femes covert should thereafter he sold and conveyed, and impliedly abolished all other modes of conveyance; and if the charter or any similar act was in force at the time of the execution of the deed in question, and if no subsequent statute has been passed confirming the title, the deed, as against Jane Van Winkle and her *198 heirs, is evidently void. But in Jackson v. Gilchrist, (15 Johns. Rep. 89,) where this charter and other colonial acts underwent a full, learned and able discussion, it was remarked by Chief Justice Thompson, who delivered the opinion of the court, that “ it has been the genera], if not the universally received opinion, that the charter was not in force here after the revolution of 1688 and he quotes from the journals of the general assembly of New-York, of the 24th of April, 1691, wherein it was “ resolved, nemine contradicente, that all the laws consented to by the general assembly under James, Duke of York, and the liberties and privileges therein contained, granted to the people, and declared to be their rights, not being observed, and not ratified and approved of by his royal highness, nor the late king, are null, void and of none effect; also all the several ordinances made by the late governors and councils, being contrary to the constitution of England, and the practice of the government of their majesties’ other plantations in America, are likewise null, void and of none effect, within this province.” It seems very evident, therefore, that, by the foregoing resolution, this charter and all other colonial laws consented to by the general assembly under the Duke of York, were formally abrogated or repealed, if they were not previously considered void by force of the revolution itself. The general assembly, however, on the 6th day of May thereafter, passed another act, declaratory of the rights and privileges of their majesties’ subjects in the colony, in which the same provision, relative to conveyances by femes covert, was incorporated, as was contained in the charter of 1683. (3 R. S. App. 1, 1sit ed.) This act continued in force until the 11th of May, 1697, when it was repealed by the king; (1 Van Schaack's Laws of N. Y. 5 ;) and between that time and the act of the 16th February, 1771, there appears to have been no charter or statute regulations on the subject in force here. (15 Johns. 89.)
But it is contended that, though no such statute regulations were in force, an acknowledgment was nevertheless deemed necessary by the ancient usage and custom of the colony, which usage and custom formed a part of the colonial common law. *199 It may be necessary here to consider under what circumstances this usage originated, and how extensively and universally it prevailed. For if we can trace it to its origin and find it to have grown out of the charter referred to, or other colonial laws, and to have been observed only while such charter or laws were in force, and afterwards abandoned, it loses much of the character and respect which we necessarily attach to a known and positive law. It will also be borne .in mind that, by the provisions of the charter of 1683, and the colonial act of 1691, it was required that the deed should be acknowledged by the wife in some court of record, she being secretly examined to ascertain whether she did it freely, without threats or compulsen of her husband. This charter and act, taken together, existed for a period of about fourteen years; and during that time acknowledgments were undoubtedly made in compliance with their provisions. Hence we may reasonably infer the origin of the private examination of the wife, which about that time seemed to prevail in the colony to a considerable extent. Pending the existence of this charter, two other colonial acts were also passed in relation to the acknowledgment of deeds and other conveyances. The one was passed on the 2d day of November, 1683, and was entitled “ An act to prevent frauds in conveyancing of lands.” It provided, “ that from and after the five and twentieth day of December next, after the date hereof, no grants, deeds, mortgages or other conveyances whatsoever, of any lands or tenements within this province, shall be of any force, power or validity in law, unless the said grants, deeds, mortgages or other conveyances be entered and recorded in the register of the county where such lands or tenements do lie, within six months after the day of their respective dates: Provided always, that none of the aforesaid grants, deeds, mortgages or other conveyances, shall be entered or recorded, until the party or parties who did seal and deliver the same shall make acknowledgment thereof before some one of his majesty’s justices of the peace, or that the same be, by sufficient witnesses, proved before the said justice of the peace, and certificate thereof entered on the back side of the said deed, grant, mortgage or other conveyance.” *200 The other act was passed on the 22d day of October, 1684, and was entitled “ A bill to prevent deceit and forgery.” It declared, “ that no bargain, sale, mortgage or grant of any house or land within this province shall be holden good in law, except the same be done by deed in writing, under the hand and seal of the grantor, and delivery and possession given in part in the name of the whole by the said grantor or his attorney so authorized under hand and seal, and unless the said deeds be acknowledged by the said grantor before one of the judges of oyer and terminer and general jail delivery, within one year after sealing thereof, and recorded as is prescribed in an act entitled * An act to prevent frauds in conveyancing of lands.’ ” These acts of course shared the fate of the charter. But no one can doubt that, dining their existence as laws, they were generally observed; and this in my mind sufficiently accounts for the origin of the acknowledgment of deeds in the colony by persons other than femes covert. Besides, the practice of acknowledgment, which came into use under the charter and the other colonial acts referred to, would be likely to continue after their repeal. For, in the then existing state of the colonies, it is not probable that such an event would be generally known until some time afterwards; nor can we suppose that a practice of this kind, enjoined by law, and continued for a series of years, would be readily abandoned, although the law itself should cease to operate. But we have further evidence, in my opinion, that the practice originated under the charter and laws referred to, in the fact that numerous conveyances were executed by femes covert, as well as other persons, since the repeal of the act of 1691, without acknowledgment by the grantors, by which large and valuable estates have passed, the validity of which conveyances is not now questioned. It is true that, in many instances, such conveyances were recorded; but the proof of their execution before the officers granting the certificates, was made by the subscribing witnesses. (17 Wend. Rep. 119; 3 R. S. App. 22, 1st ed.) We may also infer that the practice of acknowledgment was further promoted by the act of January 27th, 1710, which authorized such deeds as were acknowledged *201 and recorded in pursuance of the act, or the transcripts thereof, to be given in evidence in any court of record within the colony. (3 R. S. App. 5, 1 sí ed.) And it seems that, after the passage of this act, if not before, the practice of acknowledgment by married women was the same as that of other persons; and from this period until the act of 1771, there appears to have been no settled or fixed rule on the subject, but on the contrary, it is said, “ a loose and unsettled practice prevailed.” (15 Johns. R. 89.) I think therefore we may justly doubt whether any usage or custom existed in the colony, at the time of the execution of the paper in question, which made the acknowledgment of the wife, before a public officer, indispensably necessary to give effect to her deed.
But admitting this conclusion to be incorrect, still I am inclined to the opinion that the deed in question was confirmed, so far as any want of acknowledgment was concerned, by the act of the 16th of February, 1771, entitled “An act to confirm certain ancient conveyances, and directing the manner of proving deeds to be recorded.” (3 R. S. App. 22, 1st ed.) The preamble and first section of the act are as follows: “ Whereas it has been an ancient practice in this colony to record deeds concerning real estates, upon the previous acknowledgment of the grantors, or proof made by one of the subscribing witnesses of the execution of the instruments before a member of his majesty’s council, a judge of the supreme or county court, or a master in chancery, and sometimes before a justice of the peace: And whereas, there are lands and tenements held under the deeds of femes covert, not acknowledged in manner aforesaid, and yet made, bona fide, and for valuable considerations ; the purchasers whereof, and those holding under them ought to be secured both in law and equity, against the respective grantors, their heirs and assigns : Be it therefore enacted and declared, &c., that no claim to any real estate, whereof any person is now actually possessed, whether as tenant in common, or otherwise, shall be deemed to be void upon the pretence, that the feme covert granting the same, had not been privately examined before any of the public officers or magistrates aforesaid, &c.” This act, I think, was evidently *202 intended to confirm, in some way, all such deeds as are. mentioned in the preamble, made in good faith and for a valuable consideration; and the words, “ not acknowledged in manner aforesaid,” clearly indicate to my mind, that the deeds of femes covert, particularly alluded to, were executed without any acknowledgment. For it can hardly be presumed that the phraseology here employed would have been used, if such deeds had been acknowledged upon a private examination, or in any other mode. The enacting clause also shuts out all pretence that a private examination, before any of the public officers mentioned, was necessary; and confirms the practice, theretofore in use, of proving the execution of deeds, for the purposes of record, before the officers granting'the certificates, by the subscribing witnesses. It will be further observed that, by this clause, no claim to any real estate, whereof any person was then actually possessed, could be defeated upon the pretence, that the feme covert granting the same had not been privately examined before any one of the officers or magistrates named: thereby plainly implying, it seems to me, that the deeds of femes covert,_ mentioned in the preamble as having been executed without any acknowledgment, might be proved by the subscribing witnesses; and that, upon such proof, no pretence, or rather presumption of law, should be set up, that the wife had acted under the coercion of the husband.
This view of the subject seems to be borne out also by the. colonial act of 1710, to which I have before alluded, entitled “ An act for the better settlement and assurance of lands in this colony.” The 4th section of the act reads as follows : “ Whereas by many accidents, the deeds and writings relating to estates, some time have been, and may hereafter be destroyed, consumed and lost, whereby the lawful and rightful owner of any lands, messuages, houses, tenements and hereditaments, may be exposed to many doubtful, ■ expensive, and vexatious suits, and other inconveniences; for the preventing whereof, Be it enacted-by the authority aforesaid, that all and every deed or deeds, conveyance or conveyances, and writings, relating to the title or property of any lands, messuages, tenements, or heredita *203 mcnts, within this colony, which have been already, or shall be hereafter executed, being duly acknowledged and recorded in the secretary’s office of the said colony, or in the county records, where such lands are situate and being; such deed or writings so recorded, or transcript thereof, shall be good and effectual evidence in any court of record within this colony, to all intents and purposes, as if the original deed or deeds, conveyance or conveyances, and writings, was or were produced and proved in court.” This section, in my judgment, clearly implies that all original deeds, conveyances and writings, relating to the title of any lands or tenements within the colony, might be proved in court on the trial; and it makes no distinction between the deeds of femes covert, and those of other persons. The only object of the acknowledgment of a deed, expressed by this section, seems to have been to perpetuate the evidence of its execution by a proper record; and to make the production of such record, or a transcript thereof,, evidence, the same as proof . of the original. It may therefore be safely inferred, I think that the colonial legislature of 1710 sanctioned the principle that a feme covert, in conjunction with her husband, might convey her real estate by deed, without any acknowledgment before a public officer. The acknowledgment seems to have been merely one of the modes of proving the execution. Other evidence of execution, such as the testimony of the subscribing witnesses, was undoubtedly admissible under the then existing law.
The case of Jackson v. Gilchrist has been relied on, by the counsel for the defendant in error, to show that some acknowledgment by the wife, taken before a public officer, was necessary to pass her estate. But in that case the court was not. called Upon to decide whether a deed executed by the wife, without any acknowledgment before a public officer, was valid. The question there was, whether a certain certificate or memorandum, endorsed on the deed, was sufficient, of itself, to prove the execution. The certificate, or memorandum was in the following words: “ This day came before me, one of his majesty’s justices for the county of Essex, the within named Joshua Hun *204 lokeand Ann his wife, to acknowledge this indenture, to be their acts and ' deed: this 19th of February, 1711. Attested per me, ■ Jno. Blanchard.” The deed was held to be valid, and the certificate or memorandum sufficient proof of its execution, especially under the colonial act of 1771, notwithstanding the defect in form. The above form certainly cannot claim to be any higher or more satisfactory evidence of the execution of a deed, than proof by the subscribing witnesses. And even supposing, in this case, there had been an acknowledgment of Jane Van Winkle, before a competent officer, without a private examination, and that a certificate to that effect had been endorsed on the deed—which it is admitted, by the counsel for the defendant in error, would have been a full compliance with the usage of the colony, prior to the act of 1771—would such certificate be a more safe and reliable medium of proof than the testimony of the subscribing witnesses ? Or could the court, upon such certificate, come to a more satisfactory conclusion as to the free consent of the wife 7 I think not. For, in the examination of the subscribing witnesses, all_ the facts and circumstances attending the execution could be inquired into, and any coercion of the husband most probably detected. No greater security, at best, would be likely to result from a certificate of the simple fact of acknowledgment. There is, I believe, no dispute, that deeds of persons other than married women could be proved without acknowledgment ; and so long as the private examination of the wife was dispensed with and deemed to be unnecessary, I can see no good reason why her estate should not pass in the same manner as that of her husband.
From all the knowledge or information, therefore, which I have been able to obtain on the subject, it seems clear to my mind that the mode of proving the execution of deeds, as well of femes covert as other persons, by the subscribing witnesses, prevailed in the colony without interruption, at least from the repeal of the act of 1691, until the year 1771 j and the better evidence seems to be that such was the only mode in use previous to the charter of liberties in 1683. This mode, certainly, as well as others, is recognized by the act of 1771 as “ an ancient *205 practiceand is equally entitled to be upheld. The present case is also analogous to Lloyd v. Taylor, (1 Dall. Rep. 17.) There the question arose whether the deed under which the defendant, claimed title, having been executed by a feme covert in conjunction with her husband, without acknowledgment, was valid under the colonial law of Pennsylvania; and, in answer to the objection raised by counsel, the language of the case is as follows : “ But it appearing in evidence that it had been the constant usage of the province formerly for femes covert to convey their estates in this manner, without an acknowledgment or separate examination; and that there were a great number of valuable estates held under such titles, which it would be dangerous to impeach at this time of day, the court gave a charge to the jury in favor of the defendants, founded on the maxim communis error facit jus.” I consider this decision entitled to great weight, and in all respects applicable to the present case.
Pam aware that, accustomed as most of us are to our present statute mode of conveyancing, we are at first sight led to believe that all conveyances of married women are defective without a proper acknowledgment before a public officer. But when we look at the situation of the colony in its early settlement, and consider the sparseness of its population, the cheapness of land, and the defect of legal learning among its inhabitants, besides the inconvenience of access to public officers competent to perform the duties now required in this respect, much of the difficulty disappears, and we can easily account for the loose, and, to us, unsatisfactory mode of conveying estates which then prevailed. Were we required to hold the same strictness in relation to conveyances then made, as to those executed under our present statute regulations, interminable litigation would arise, and great injustice would be done to the holders of estates under such titles; in fact, there would be no end to the hardships and injustice growing out of such a state of things. Lands which have received all and even twice their value from improvements made imder such titles, would be swept away from the present occupants, and the descendants of the grantors would in many instances receive the benefit, not only of the *206 full consideration of the original purchase, hut of all the labor and earnings of succeeding generations.
From the best consideration I have been able to give the subject, I am of the opinion that the deed in question, if executed in good faith and for a valuable consideration, was valid, notwithstanding any want of acknowledgment; that the defendant below was entitled to prove the. execution of the same by the subscribing witnesses,-or any other competent evidence; and that any question of fact raised at the trial upon the insufficiency of the proof to establish the deed, should have been submitted to the jury.
Another objection is taken to the deed, viz., that it purports to convey only the life estate of John Van Winkle.
The deed purports to have been made between John Van Winkle of Saddle river, in the county of Bergen, in the eastern division of the province of New-Jersey, yeoman, and Jane his wife, of the first part, and Jacob Van Winkle of Ackqueckenong, in the county of Essex, in said eastern division, cordwainer, of the second part; and then goes on to witness, that the said John Van Winlde, (by and with the voluntary consent and good liking of Jane his said wife, testified by her being a party hereunto, and signing and sealing these presents,) for and in consideration of the sum of one hundred and fifteen pounds to him in hand paid, &c., hath granted, bargained, sold, released and confirmed, and by these presents doth grant, bargain, sell, release and confirm, unto the said Jacob Van Winkle, his heirs and assigns forever, lot No. 7, [being the premises in question,] together with all and singular the rights, liberties and privileges to the same belonging or in anywise appertaining, and also all the estate, right, title, interest, possession, claim and demand whatsoever, either in law or equity, of them the said John Van Winkle and Jane his wife, of, in or to any part or parcel thereof; with the usual habendum, to the said Jacob Van Winkle, his heirs and assigns forever.
Thus far, the grant, in terms, proceeds from John Van Winkle alone, notwithstanding Jane is a party to the deed, and by that means gives her voluntary consent to the acts of her hus *207 band; and did the grant end here, it might be very questionable whether the estate of the wife would pass under it, although such might have been the intention of the parties. But immediately after the habendum,, under the separate grant of the husband, follows the joint grant of the parties of the first part, in the following words: “ And the said John Yan Winkle and Jane his said wife, for themselves, their heirs, executors and administrators, and for every of them, do grant and grant to and with him, the said Jacob Yan Winkle, his heirs and assigns, that he, the said Jacob Van Winkle, shall and may at all times, and from time to time forever hereafter, peaceably and quietly have, hold, possess and enjoy the above granted lot of land and premises, without any let, suit, trouble, denial or interruption of them the said John Yan Winkle and Jane his wife, their heirs or assigns, or any other person or persons claiming by, from or under them and any of them.” Next follows the usual clause of warranty by John Yan Winkle, and the deed purports to be subscribed, sealed and delivered, in the ordinary manner, in the presence of two attesting witnesses.
This second or joint grant of the husband and wife seems merely to come in aid of the first, and, I think, leaves no doubt of the intention of the wife to convey her estate. And “ where there is sufficient matter to guide the intent of the party, in such manner that lay persons may understand it; or sufficient matter is contained in the deed to show the intent; there the deed, and the words therein, shall be taken so as to make the deed good rather than destroy it.” (1 Shep. Touch. 253, note (1) Am. ed. of 1808.) Also, in construing a deed according to the intent, the construction must be upon the whole deed, and not one part taken and another left out; and a deed ought to be so expounded that all parts of it may stand together. (Id. ; 2 Bl. Comm. 379.) • It is true, if there be two clauses so totally repugnant to each other, that they cannot stand together, the first shall be received and the latter rejected. (2 Bl. Comm. 380.) But in this deed I can see no such repugnancy. All parts of it harmonize sufficiently, and apt words are used in the grant to pass the estate. I think also the deed imports a suffi *208 cient consideration. It is true, the receipt of the money purports to have been by the husband alone. But to this I can see no particular objection, as the money would undoubtedly have passed into his hands under any circumstances; for he had the legal right to control it.
In my opinion, therefore, the judgment of the supreme court should be reversed, and a venire de novo awarded, with costs to abide the event.
Root and Scott, Senators, also delivered opinions in favor of reversing the judgment of the supreme court, holding that the deed to Jacob Tan Winkle, of May 5th, 1760, was sufficient to convey all the estate of Jane "Van Winkle, notwithstanding she had never acknowledged it.
On the question being put, “ Shall this judgment be reversed ?” all the members of the court present who heard the argument, twenty-one in number, voted for reversal.
Judgment reversed.

 The report of this case in 2 Hill, 240, presents only an abstract of the opinion of the supreme court upon a single point. That part of the opinion here referred to is as follows: “ The defendant, being in possession under John Van Winkle, the tenant for life, stands in the same position as respects the plaintiff, and is clothed with no greater rights. He could do no act to the prejudice of the estate in reversion, during the existence of the tenancy, as no right of entry accrued till its termination ; and after that, he was a mere tenant at sufferance. (2 Bl. Comm. 149, 150.) The life estate did not terminate till 1816, the same year of the conveyance to Simeon by his sister. The deed to Simeon bears date on the 19th of December, 1816. The precise time of the year when John died does not appear; but whatever may have been the interval, there is no color for an adverse possession during the short period, that can avoid the deed. This ground of defence was repudiated, after a much greater lapse of time, and stronger acts of ownership, in a-similar case. (20 Johns. Rep 301.)”